OPINION
{¶ 1} Following a trial by jury, appellant, John T. Ficzeri, was convicted on one count of felonious assault resulting from events which occurred on April 28, 2003. He now appeals.
 {¶ 2} Before 2001, appellant and Warren Felder co-existed as cordial neighbors for some thirty years.[1] However, in the spring of 2001, Mr. Felder hired a lawn service company to mow his yard. According to appellant, the lawn crew frequently blew grass trimmings and other debris into his yard. Appellant disapproved of this practice and, although he admitted Felder was not directly responsible for this problem, his relationship with Felder quickly deteriorated.
 {¶ 3} From 2001 through April of 2003, the neighbors were hostile and equally abusive to one another; however, as one might expect, each maintained the other was the primary agitator: Felder testified appellant would push or deposit leaves, snow, and ice chunks onto his lawn; Felder also testified, without detail, how he had lived "under three years of continuing intimidation, harassment, threats, and * * * terror." Similarly, appellant testified Felder was verbally abusive to him "to the point where I didn't want to even be in the yard or out in the front when he was around." It was also established that Felder threatened to kill appellant on more than one occasion.
 {¶ 4} Both parties offered different versions of what transpired on April 28, 2003. According to Felder, he went outside at approximately 8:00 p.m. to spray Roundup on a strip of grass separating his property from appellant's.[2] Felder carried a container of Roundup and a golf club; Felder believed he needed to carry the club for protection due to his fear of appellant. As he finished spraying, Felder testified:
 {¶ 5} "When I got back to the end of the strip, I was backing out, I turned around, * * *. As I turned around [appellant] came running across the front, my front yard, and hit me like a ton of bricks."
 {¶ 6} Felder testified appellant drove him, like a linebacker, up against the back gate of the chain-linked fence separating the properties. Appellant then lifted Felder's arm and "smashed" it down on the top rail of the fence gate. Felder exclaimed "you broke my arm" at which point, according to Felder's testimony, appellant punched him in the face and knocked him to the ground. Appellant then broke the head of Felder's golf club over the fence and struck him with the shaft between five and seven times. Felder testified appellant then kicked him in the stomach and, before walking away, stated: "You know what you are? You're a dirty old fart Jew." As a result of the melee, Felder experienced a fracture to his humerus bone and a series of cuts and abrasions.
 {¶ 7} Appellant's testimony reflects a different version of events; to wit, on the evening of April 28, 2003, appellant stated he was outside talking to a neighbor when he noticed Felder walk behind his house, in between the fence and appellant's truck. Appellant testified he became concerned because his wife was alone in their house.[3] Appellant approached his driveway, walked around his truck, and, as he approached the rear of the vehicle "[up] stood Warren Felder from a crouched position." Appellant maintained Felder approached him with the golf club raised in his left hand. According to appellant, he closed the distance between himself and Felder, grabbed Felder's arm, and forcibly pushed him against his house. Appellant claimed he lost his grip on Felder and both men stumbled towards the fence gate at which point Felder fell down and landed on his arm. From the ground, Felder exclaimed "you broke my arm, you cocksucker." Appellant testified he then took the golf club, broke it over the fence, and called the police. Appellant testified he did not "slam" Felder's arm onto the fence, punch Felder, kick Felder, or strike Felder with the golf club shaft. Moreover, appellant maintained he never made a derogatory racial remark to Felder.
 {¶ 8} Although appellant told police Felder attacked him with the golf club, appellant was subsequently arrested. On November 14, 2003, appellant was indicted on two counts of felonious assault, in violation of R.C. 2903.11(A)(1) and R.C. 2903.11(A)(2), felonies of the second degree (Counts One and Three), and two counts of aggravated assault, in violation of R.C. 2903.12(A)(1) and R.C. 2903.12(A)(2), felonies of the fourth degree (Counts Two and Four).
 {¶ 9} On June 29, 2004, defense counsel filed a motion in limine objecting to the admission of the deposition testimony of Dr. John Bucchieri, Felder's orthopedic physician. Defense counsel contended that the deposition should be excluded because it purported to offer expert testimony on the cause of Felder's fracture, but failed to meet the dictates of Evid.R. 702 or Daubert v. Merrell Dow Pharmaceuticals, Inc.
(1993), 509 U.S. 579. The trial court overruled the motion from the bench at a hearing before trial. The case moved forward and, after a trial by jury, appellant was convicted on one count of felonious assault (Count One) and acquitted of all other charges. Appellant was sentenced to two years community control.
 {¶ 10} On July 12, 2004, defense counsel moved the trial court for a new trial pursuant to Crim.R. 33. Defense counsel claimed that the verdict of acquittal on the aggravated assault count (Count Two) and the guilty verdict on the felonious assault count (Count One) were inconsistent. On July 29, 2004, the trial court denied appellant's motion. Appellant now appeals and raises four assignments of error:
 {¶ 11} "[1.] The trial court erred in denying the motion for a new trial.
 {¶ 12} "[2.] The trial court erred in admitting opinion testimony of Dr. Bucchieri and Dr. Labonne, over objection, because neither met the requirements of Evid.R. 702 or Daubert v. Merrel Dow, 509 U.S. 579
[sic].
 {¶ 13} "[3.] The conviction is based on insufficient evidence because the state never proved when Tom Ficzeri `smashed' Warren Felder's arm on top of the fence rail, he (Ficzeri) knew such an act would cause a serious bone fracture. (Emphasis sic.)
 {¶ 14} "[4.] The verdict is against the manifest weight of the evidence."
 {¶ 15} In his first assignment of error, appellant argues the aggravated assault charge, of which he was acquitted, requires the same proof and is therefore identical to the felonious assault charge, of which he was convicted. Because the verdicts were inconsistent, appellant argues, the trial court erred in denying his motion for a new trial.
 {¶ 16} The decision to grant or deny a new trial pursuant to Crim.R. 33 rests with the sound discretion of the trial court. State v. Hill
(1992), 64 Ohio St.3d 313, 333. A trial court's ruling on a motion for new trial will not be disturbed save an abuse of that discretion. Statev. Valentine, 11th Dist. No. 2002-P-0052, 2003-Ohio-2838, at ¶ 14. The discretionary decision to grant a Crim.R. 33 motion is an extraordinary measure which should be employed only when the evidence weighs heavily in favor of the moving party. Id.
 {¶ 17} In appellant's motion for new trial, he alleged the verdicts in the case relating to Count 1 (felonious assault) and Count 2 (aggravated assault) were inconsistent and therefore contrary to law.
 {¶ 18} R.C. 2903.11(A)(1) defines the offense of felonious assault and provides, in relevant part: "[n]o person shall knowingly * * * cause serious physical harm to another or another's unborn."
 {¶ 19} R.C. 2903.12(A)(1) defines the offense of aggravated assault and provides:
 {¶ 20} "No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause serious physical harm to another or another `s unborn."
 {¶ 21} Appellant maintains that the jury's verdict of acquittal on the latter offense necessarily precludes a verdict of guilty on the former offense. Appellant's position is derived from the Ohio Supreme Court's decision in State v. Rhodes (1992), 63 Ohio St.3d 613. In Rhodes, the court was asked to decide whether a defendant on trial for murder bears the burden of establishing that he was "`under the influence of sudden passion or in a sudden fit of rage, either of which was brought on by serious provocation occasioned by the victim that * * * [was] reasonably sufficient to incite the * * * [defendant] into using deadly force * * *' —, the mitigating circumstances of R.C. 2903.03(A) —, in order for a jury to find the defendant guilty of voluntary manslaughter rather than murder." Id. at 616-617. The court ultimately responded in the affirmative to this issue.
 {¶ 22} Appellant, however, does not rely upon the primary holding inRhodes but cites to dicta to support his argument. Specifically, in the body of its analysis, the Rhodes court pointed out that voluntary manslaughter is an inferior degree of murder, i.e. the offenses have identical elements with the exception of the mitigating element. See,State v. Deem (1988), 40 Ohio St.3d 205, 210-211. As such, if a defendant on trial for murder or aggravated murder presents evidence of the mitigating circumstances set forth in R.C. 2903.03, the defendant is entitled to a jury instruction on voluntary manslaughter as an inferior degree of murder. Rhodes, supra. Conversely, if a defendant is not
charged with murder or aggravated murder, but is charged only with voluntary manslaughter, neither party is required to establish the mitigating circumstances. "Rather, the court presumes (to the benefit of the defendant) the existence of one or both of the mitigating circumstances as a result of the prosecutor's decision to try the defendant on the charge of voluntary manslaughter rather than murder." Id. at 618.
 {¶ 23} Appellant applies the foregoing analysis in a selective, if not creative, fashion to the instant case. Appellant notes that aggravated assault is an inferior degree of felonious assault. That is, the elements of aggravated assault are identical to those of felonious assault with the exception of the additional mitigating element. Because aggravated assault was charged in the indictment appellant reasons the mitigating element was "presumed" and neither party was required to put forth evidence of these facts. To achieve a conviction on both counts the prosecution needed to prove, beyond a reasonable doubt, that appellant knowingly caused serious physical harm to the victim. In appellant's view, his acquittal on the aggravated assault offense logically and legally precludes a finding of guilty on the felonious assault offense. We disagree.
 {¶ 24} While appellant's argument is innovative, we do not believeRhodes can be applied in the manner appellant urges. In Rhodes, the court addressed the issue of which party, if any, has the burden of production in circumstances where a greater offense is the principle charge as opposed to when a lesser offense is the principle charge. According to dicta in Rhodes, mitigating circumstances are "presumed" when an inferior offense is the principle charge in the indictment. That is, neither party must present evidence on the matter when aggravated assault (or another offense of inferior degree) is the principle charge. However, where, as here, appellant was charged with both felonious assault and aggravated assault, he was not entitled to the benefit of the presumption of the mitigating circumstances.
 {¶ 25} Rhodes makes it clear that a defendant on trial for a "superior" degree of an offense bears the burden of proving mitigating circumstances contained in the inferior degree of the offense; namely, that he acted under the influence of sudden passion or in a sudden fit of rage, either of which was occasioned by the victim, to be convicted of the "inferior" rather than the "superior" offense. Id. at syllabus. Were we to follow appellant's reasoning, the presence of a lesser, "inferior" offense in a multi-count indictment would effectively negate the greater offense because, in so charging, the state would invariably concede mitigating circumstances. Rhodes neither requires nor implies this outcome and we decline appellant's invitation to utilize it in this manner.
 {¶ 26} The jury heard ample evidence that appellant knowingly caused serious physical harm to the victim. While appellant attempted to persuade the jury his actions were a result of "sudden passion" or "a fit of rage" occasioned by the victim, he was unsuccessful. Accordingly, appellant was convicted of felonious assault and acquitted of the inferior offense of aggravated assault. These separate determinations are not inconsistent. The trial court did not abuse its discretion in denying appellant's motion for a new trial. Thus, appellant's first assignment of error is without merit.
 {¶ 27} In his second assignment of error, appellant alleges the trial court erred in admitting the testimony of two state experts. Appellant argues the testimony of Dr. John Bucchieri, an orthopedic physician, and Dr. Stephen LaBonne, a DNA technical manager at the Lake County Crime Lab, violated Evid.R. 702 and the United States Supreme Court's decision in Daubert v. Merrell Dow Pharmaceuticals, Inc. (1993), 509 U.S. 579.
 {¶ 28} Rulings regarding the admissibility of expert testimony rest with the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. Frank v. Vulcan Materials Co.
(1988), 55 Ohio App.3d 153, 155.
 {¶ 29} Evid.R. 702 governs the testimony of expert witnesses. For expert testimony to be admissible, it must relate to matters "beyond the knowledge or experience possessed by lay persons" or dispel "a misconception among lay persons[.]" Evid.R. 702(A). Moreover, an expert witness must possess "specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony." Evid.R. 702(B). Finally, the expert's testimony must be based upon "reliable scientific, technical or other specialized information." Evid.R. 702(C). If "the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:
 {¶ 30} "(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;
 {¶ 31} "(2) The design of the procedure, test, or experiment reliably implements the theory;
 {¶ 32} "(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result." Evid.R. 702(C)(1)-(3).
 {¶ 33} In Daubert, the United States Supreme Court held that the language of the Federal Rules of Evidence governs the admissibility of expert, scientific evidence. As such, the "Rules of Evidence — especially Rule 702 — * * * assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. Pertinent evidence based on scientifically valid principles will satisfy those demands." See, Daubert, supra, at 597.
 {¶ 34} With this in mind, the Supreme Court of Ohio designated the following four factors, adopted from Daubert, supra, to be considered in evaluating the reliability of scientific evidence: "(1) Whether the theory or technique has been tested, (2) whether it has been subjected to peer review, (3) whether there is a known or potential rate of error, and (4) whether the methodology has gained general acceptance." Miller v.Bike Athletic Co., 80 Ohio St.3d 607, 611, 1998-Ohio-178. None of these factors is determinative and the inquiry should focus on the principles and methods used by the expert in arriving at his or her conclusion, not the conclusion itself. Miller, supra, at 611-612, citing, Daubert,
supra, at 595. Moreover, "there is no requirement that an expert utter any `magic language,' i.e., that his opinion was within the reasonable degree of certainty or reasonable degree of certainty within the particular knowledge of his professional experience." Chaffins v.Al-Madani, 11th Dist. Nos. 2002-P-0037 and 2003-P-0090, 2004-Ohio-6703, at ¶ 40.
 {¶ 35} Under the circumstances, it is clear that Drs. Bucchieri and Labonne were qualified experts who testified on matters outside the knowledge of laypersons. See Evid.R. 702(A) and (B). Accordingly, our inquiry will center on whether the testimony was relevant and reliable pursuant to Evid.R. 702(C). We shall address the testimony of each expert in order.
 {¶ 36} Dr. Bucchieri, a Board certified orthopedic specialist, testified via a video recorded deposition at trial. According to his testimony, Dr. Bucchieri specializes and treats bone and joint disorders involving trauma, arthritis, and other injuries, particularly those which occur in the hand and upper extremities. Dr. Bucchieri was called by the state to offer testimony as to the cause of the victim's fractured left humerus bone (near the elbow). During his deposition, Dr. Bucchieri was asked by the prosecutor whether he had an opinion, based upon his experience and expertise, as to how the fracture was caused. In response, the doctor stated a fracture of this type could be caused by two potential mechanisms: (1) a fall on a flexed elbow or (2) a direct blow to the humerus bone. Counsel for appellant objected to this testimony. At the hearing on appellant's motion in limine, counsel argued the foregoing testimony was inadmissible because it was non-specific, without foundation, and would not assist the trier of fact. We disagree.
 {¶ 37} Dr. Bucchieri's testimony was based upon his observations, experience, and expertise as an orthopedic specialist. The testimony narrows the possible range of causal mechanisms to two separate modalities, viz., a fall or a direct blow. In our view, Dr. Bucchieri's qualifications and experience illustrate he was well suited to testify on the cause of the victim's injury; Dr. Bucchieri's testimony is relevant to the issue of cause and he provided adequately specific information to assist the jury in its construction of the evidence. After thoroughly reviewing the testimony of Dr. Bucchieri, we believe it meets the requirements of Evid.R. 702 as well as Daubert. Accordingly, the court did not abuse its discretion in denying appellant's motion in limine pertaining to Dr. Bucchieri's testimony.
 {¶ 38} Next, appellant calls Dr. Labonne's testimony into question; however, appellant fails to detail any specific concerns he has with Dr. Labonne's testimony. Moreover, Dr. Labonne's testimony addressed issues pertaining to charges of which appellant was acquitted, i.e., felonious assault and aggravated assault with a broken golf club. Accordingly, the admission of his testimony in no way prejudiced appellant. Even if the court erred in declaring his testimony admissible, the error was of no moment.
 {¶ 39} Appellant's second assignment of error is overruled.
 {¶ 40} Appellant's third assignment of error attacks the sufficiency of the evidence as it pertains to the mens rea component of the felonious assault charge. Appellant argues the state failed to prove that, upon "smashing" the victim's arm on the fence, he knew the act would cause serious physical harm.
 {¶ 41} In considering whether the evidence at trial was sufficient to support the conviction, an appellate court examines the evidence and determines whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. State v. Reid
(Apr. 19, 1996), 11th Dist. No. 95-A-0038, 1996 Ohio App. LEXIS 1549, at 6. "[T]he inquiry is, after viewing the evidence in the light most favorable to the prosecution, whether any reasonable trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, 273.
 {¶ 42} Here, appellant contends the state failed to offer sufficient proof that he knew his actions would cause the victim's arm to break. A person acts knowingly, regardless of his purpose, where he is aware that his conduct would probably cause a certain result or be of a certain nature.[4] R.C. 2901.22(B).
 {¶ 43} In the instant matter, the state offered evidence that appellant charged and "drove" his body into the victim like "a linebacker." The victim was ultimately pushed into a fence at which time appellant grabbed the victim's arm and smashed it down on top of the fence rail. In our view, an ordinary person would be aware that smashing the arm of a 78 year old individual onto a fence rail would probably cause "serious physical harm", e.g., a fractured arm. When viewed in a light most favorable to the state, we believe sufficient evidence was offered to prove the "knowingly" element of felonious assault. Appellant's third assignment of error lacks merit.
 {¶ 44} In his final assignment of error, appellant argues his conviction was against the manifest weight of the evidence.
 {¶ 45} "`In determining whether the verdict was against the manifest weight of the evidence, `* * * the court reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. * * *'" State v. Schlee (Dec. 23, 1994), 11th Dist. No. 93-L-082, 1994 Ohio App. LEXIS 5862, at 14-15, quoting, State v. Davis
(1988), 49 Ohio App.3d 109, 113.
 {¶ 46} In the instant case, appellant maintains the conviction was against the manifest weight of the evidence because he and the victim had disparate versions of what occurred. To be sure, appellant and the victim presented two different renditions of the attack; the jury heard both versions and found the victim's testimony more credible than appellant's. We bear in mind that the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact to decide. The victim's version of the events was not unbelievable; while appellant's version may be plausible as well, the jury chose to believe the victim. We cannot say the jury clearly lost its way in doing so.
 {¶ 47} Appellant also makes a conclusory allegation that Detective Bertone's investigation was conducted with a view to merely confirming initial police reports that appellant was the aggressor in the confrontation. Appellant's argument suggests a conspiracy of which he offers no supportive evidence. The record indicates Bertone's investigation was conducted properly without any ostensible bias towards appellant. The state of the evidence as it pertained to Bertone's investigation does not weigh against the jury's verdict.
 {¶ 48} Further, appellant argues at great length that he did not call the victim a "Jew fart" subsequent to the physical attack. The question of whether appellant made this statement had no bearing upon the charges on which he was tried. We recognize that racial epithets of any stripe are heinous; however, we do not think the presence of this testimony militated in favor or against appellant's ultimate conviction for felonious assault. We believe this particularly true where, as here, appellant testified he never made such a remark.
 {¶ 49} Taken as a whole, we believe the weight of the evidence supported the jury's verdict convicting appellant for felonious assault. Therefore, appellant's fourth assignment or error is without merit.
 {¶ 50} For the above reasons, appellant's four assignments of error are without merit and the judgment of the Lake County Court of Common Pleas is therefore affirmed.
Ford, P.J., and O'Toole, J., concur.
[1] On April 28, 2003, the date of the offense, appellant was 58 years old and Felder was 78 years old.
[2] According to Felder, his grass cutting crew would not cut this strip due to appellant's continuing irritation regarding grass clippings and the like being thrown onto his lawn and driveway.
[3] Although appellant expressed this concern, he later indicated Felder was never abusive or otherwise acrimonious towards his wife.
[4] In its brief, the state sets forth an erroneous statement of Ohio law regarding presumptions and the manner in which they relate to proving the mens rea element of a criminal charge. The state urges: "Ohio law provides that a person is presumed to intend the natural, reasonable, and probable consequences of his voluntary acts." In Sandstrom v. Montana
(1979), 442 U.S.510, the United States Supreme Court held any instruction which could be interpreted by a jury as "conclusive" or "burden shifting" regarding any element of a crime violates the due process clause of the Fourteenth Amendment. The Court reasoned that a conclusive presumption attaching to any element of a criminal charge conflicts with the overriding presumption of innocence enjoyed by the accused and invades the factfinding function the law assigns solely to the jury. Id. at 523. Moreover, a presumption which acts to shift the burden of persuasion to the defendant offends the principle that the state must prove every ingredient of an offense beyond a reasonable doubt. Id. at 524. While the jury instructions did not include any language of presumption, we take issue with the state's assertion of the law. The state's position suggests it enjoys an ostensibly conclusive presumption regarding the consequences of a person's "voluntary actions." Were this true, strict liability would attach to the "knowingly" element of a charge if the state presented some evidence that the defendant acted voluntarily. Such an outcome offends due process as it lessens the state's burdens of proof and persuasion. Where the state is required to prove a defendant acted "knowingly," it must do so beyond a reasonable doubt without the benefit of conclusive or persuasion-shifting presumptions of the sort alluded to by the state in its brief.