OPINION
{¶ 1} Appellant Rose Kate Roseborough appeals from her convictions for aggravated murder, attempted murder, and arson in the Ashland County Court of Common Pleas. The Appellee is the State of Ohio. The relevant facts leading to this appeal are as follows.
 {¶ 2} In the early afternoon of April 7, 2003, police and firefighters were called to the scene of a second-story house fire on Edgehill Avenue in Ashland, Ohio, where appellant resided with her three daughters, her boyfriend Bob Bursley (the father of two of the girls), and boarder Jason Balough. Appellant's four-year-old daughter, Caitlin Miller, was rescued by a police officer from an upstairs bedroom and survived the ordeal. However, appellant's eleven-month old twin daughters, Julia and Lucie Bursley, who were also in an upstairs bedroom, were overcome by smoke inhalation. Julia was pronounced dead at Ashland Samaritan Hospital later that afternoon. Lucie died at Akron Children's Hospital on April 10, 2003.
 {¶ 3} Subsequent to investigations by fire and police officials, appellant was indicted by the Ashland County Grand Jury on two counts of aggravated murder with death penalty specifications, one count of attempted murder, two counts of involuntary manslaughter, one count of arson, one count of felony child endangering, and one count of misdemeanor child endangering.
 {¶ 4} The trial commenced on July 27, 2004. Testimony was heard over the course of the next two months, with the final rebuttal witness finishing on September 3, 2004. The jury thereafter deliberated and found appellant guilty of aggravated murder, attempted murder, and arson. Following death penalty mitigation proceedings, the jury recommended a sentence of life without parole on each aggravated murder conviction. On November 15, 2004, the trial court imposed the recommended sentences, in addition to maximum ten-year terms on the attempted murder and arson counts. All sentences were imposed consecutively.
 {¶ 5} Appellant filed a notice of appeal on December 10, 2004. She herein raises the following ten Assignments of Error:
 {¶ 6} "I. APPELLANT'S CONVICTIONS FOR AGGRAVATED MURDER AND AGGRAVATED ARSON ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTION 16, ARTICLE I OF THE OHIO CONSTITUTION.
 {¶ 7} "II. THE TRIAL COURT ERRED WHEN IT FAILED TO GRANT MS. ROSEBOROUGH'S MOTION FOR CHANGE OF VENUE.
 {¶ 8} "III. THE TRIAL COURT ABUSED ITS DISCRETION IN REFUSING TO EXCUSE THREE JURORS FOR CAUSE, WHICH RESULTED IN A BIASED JUROR BEING SEATED ON THE JURY, IN VIOLATION OF MS. ROSEBOROUGH'S RIGHT TO TRIAL BY AN IMPARTIAL JURY UNDER SECTION 10, ARTICLE I
OF THE OHIO CONSTITUTION AND THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.
 {¶ 9} "IV. THE TRIAL COURT ERRED WHEN IT COMPLETELY ABDICATED ITS MANDATORY GATEKEEPING FUNCTION REGARDING EVIDENCE WITH A SCIENTIFIC BASIS, AND PERMITTED THE STATE TO INTRODUCE UNRELIABLE EXPERT TESTIMONY THAT AN OBSERVER CAN DISCERN WHETHER THE SOOT ON AN INDIVIDUAL'S SKIN WAS PRODUCED DURING THE BEGINNING STAGE OF A FIRE OR A LATER STAGE OF A FIRE. EVID.R. 702. THIS ERROR DEPRIVED MS. ROSEBOROUGH OF HER RIGHTS TO DUE PROCESS OF LAW AND A FAIR TRIAL, AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND SECTIONS 10 AND 16, ARTICLE I
OF THE OHIO CONSTITUTION.
 {¶ 10} "V. PROSECUTORIAL MISCONDUCT DEPRIVED MS. ROSEBOROUGH OF HER CONSTITUTIONALLY GUARANTEED RIGHT TO A FAIR TRIAL, IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS, TO THE UNITED STATES CONSTITUTION AND SECTION 10, ARTICLE I OF THE OHIO CONSTITUTION.
 {¶ 11} "VI. THE STATE VIOLATED MS. ROSEBOROUGH'S RIGHT TO DUE PROCESS BY PRESENTING TWO FACTUALLY CONTRADICTORY THEORIES TO THE JURY, WHILE BEING MOTIVATED BY ITS BELIEF IN AN UNPROVABLE THIRD THEORY.
 {¶ 12} "VII. THE TRIAL COURT ERRED BY REFUSING TO GRANT MS. ROSEBOROUGH'S MOTION TO SEVER THE MISDEMEANOR CHILD ENDANGERING COUNT THAT WAS UNRELATED TO THE FIRE.
 {¶ 13} "VIII. THE PERFORMANCE OF TRIAL COUNSEL WAS DEFICIENT, AND DEPRIVED MS. ROSEBOROUGH OF THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTION 10, ARTICLE I OF THE OHIO CONSTITUTION.
 {¶ 14} "IX. THE TRIAL COURT ERRED IN PERMITTING INTRODUCTION OF PREJUDICIAL CHARACTER EVIDENCE, THEREBY DENYING MS. ROSEBOROUGH HER RIGHT TO DUE PROCESS OF LAW GUARANTEED BY THEFIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTIONS 10 AND 16, ARTICLE I OF THE OHIO CONSTITUTION.
 {¶ 15} "X. THE TRIAL COURT ERRED IN IMPOSING AND ASSESSING $23, 271.10 IN COURT COSTS ON THE DEFENDANT."
 I. {¶ 16} In her First Assignment of Error, appellant contends her convictions for aggravated murder and arson are against the manifest weight of the evidence. We disagree.
 {¶ 17} Our standard of review on a manifest weight challenge to a criminal conviction is stated as follows: "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717. See also, State v. Thompkins (1997),78 Ohio St.3d 380, 678 N.E.2d 541. The granting of a new trial "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Martin at 175,485 N.E.2d 717.
 Review of State's Case {¶ 18} The State called thirty-two witnesses in its case-in-chief. First in order among them were several individuals who witnessed the fire firsthand. Officer James Cox of the Ashland Police Department, the first public safety officer to arrive on the scene, testified that he was dispatched at 1:24 PM on April 7, 2003, along with Sergeant Steve Hoover. When he arrived, Cox saw appellant sitting on the porch; she advised him that her three children were in the upstairs bedroom which faced the staircase. Tr. at 1683. Although the officers lacked protective gear, Sergeant Hoover rescued four-year-old Caitlin and brought her outside, while Cox unsuccessfully attempted to find the twins.
 {¶ 19} Two Ashland firefighter-paramedics, Douglas Hootman and Dan McFarlin were also called to the stand. Hootman found the twins, who appeared "lifeless." Tr. at 1715. McFarlin put out the bedroom carpet fire with his foot, and observed a smoldering mattress. Tr. at 1727.
 {¶ 20} Kevin Rosser, another Ashland firefighter-paramedic, testified that he observed large-particle soot on appellant's face at the scene. (See, also, appellant's Fourth Assignment of Error, infra.) He distinguished this type of soot, which had been partially smudged off of appellant's face, from "smoke staining" that gets on and in a person's skin after being in the proximity of a fire for an extended period of time. He thus concluded that the soot on appellant would have resulted from her presence at the "earlier stage" of the fire. Tr. at 1758.
 {¶ 21} Jason Balough, a boarder who lived in a basement bedroom, recalled that he had been out late the night before, and finally went to sleep at about 6:00 AM on the morning of April 7th. He got up at about 10:30 AM, went up to the main floor to use the telephone, and thereafter spoke with appellant's boyfriend Bob Bursley for about a half an hour. After going back to sleep in the basement, he was awoken by his alarm clock shortly after 1:00 PM, noticing smoke. He checked the furnace, and then proceeded up to the main floor, where Bursley and appellant were sleeping on opposite couches in the living room. He yelled to them; however, appellant did not get up. After running out to his car to get a flashlight, Balough came back in and briefly tried to shake appellant awake before running up the stairs again. Balough and Bursley were apparently unable to get to any of the children prior to the arrival of assistance personnel.
 {¶ 22} Several witnesses were also called to testify concerning what they considered appellant's unusual behavior and statements during the period shortly after the fire. For example, Shelly Arnold, a respiratory therapist at Ashland Samaritan, recalled that appellant never came in the treatment room to see Julia, and did not cry after Julia was pronounced dead at 3:22 PM. Tr. at 1791-1800. Sandra Gwonger, a nursing assistant in the Ashland Samaritan ER, opined that there was no reason appellant could not have been with Julia during the emergency treatment. Melissa Dunlap, who works at the Ames Clinic at Ashland Samaritan, spent about an hour with appellant in the "cast room" of the hospital after the fire. During that time, appellant never inquired about her children or asked to see them, but she did offer a theory that Caitlin had started the fire with matches. Tr. at 1811. Another respiratory therapist at Samaritan, Michelle Baker, stayed with Lucie, Julia's twin, pending a life flight to Akron. Baker noted that appellant likewise did not come to check on Lucie. Tr. at 2559.
 {¶ 23} A number of witnesses were also called to testify regarding appellant's actions during the period of Caitlin and Julia's treatment at Akron Children's Hospital ("ACH"). Michele Mizda, a pediatric social worker at ACH, recalled that appellant went against her advice and agreed to a media interview just one day after the fire. Mizda described appellant as "very interested" in doing the interview, during which she referred to her children as a "demolition derby" and "little terrors." Tr. at 2625. However, otherwise appellant demonstrated little affect, and did not talk about the fire, although Mizda opined that in her experience, most parents "can't stop" talking about a traumatic fire. Id.
 {¶ 24} Dorine Kline, Bursley's maternal aunt (and the great aunt of the twins), also provided testimony of her encounter with appellant soon after the fire. Kline arrived at Ashland Samaritan after Julia had already died, and Caitlin and Lucie were on their way to Akron Children's Hospital. Appellant told Kline she had simply taken "an innocent nap" that day. Tr. at 1828. Kline did not see appellant cry or hear her say anything regarding the children. Tr. at 1833-1834. At some point, appellant asked Kline to help her to the bathroom. Kline recalled, however, that as soon as the door closed behind them, appellant's demeanor "completely" changed. Appellant stood up straight, asked to "bum" some money, and stated she would need a whole new wardrobe. Tr. at 1834. Ruby Miller, Caitlin's paternal grandmother, told jurors that she encountered appellant the day after the fire in a hospital parking lot. Appellant, in a "nasty" tone, told Ruby to "keep [her] mouth shut" and not ask Caitlin about what happened. Tr. at 2027-28. Ruby also described appellant's failure to buy new clothes for Caitlin after the fire.
 {¶ 25} Tony Suncire, a clinical coordinator the ACH burn unit, also noted that appellant did not initially stay in Caitlin's room for long periods, but she abruptly acted more supportive after Caitlin was awake and off the ventilator. Tr. at 1943. He also observed that when he would ask questions of Caitlin regarding her comfort level and the like, appellant would persistently answer for her. Appellant spoke of her "freedom," and told him she would finally "have time for herself" and would be "able to go shopping." Tr. at 1941, 1946. Cindy Hartman, an ACH burn unit nurse, testified that she also did not initially see appellant with Caitlin much, and that appellant showed no sadness. Hartman observed that on the day of the twins' funeral, appellant spoke of her new jeans, which she said made her "feel like a diva." Tr. at 1959. Kelly James, an ACH social worker, said she likewise observed no grieving, and observed that appellant would cut Caitlin off in discussions. Lori Clavity, a staff nurse at ACH, reported that appellant acted unusually when the subject of life support for Lucie was raised. Tr. at 2571.
 {¶ 26} The State also presented testimony on the issue of appellant's parenting habits as proof of her motive to rid herself of the burden of parenting. Leo Hoffman Jr., a former boarder who, like Jason Balough, had stayed in appellant's Edgehill residence for a time, described life there as "chaotic and unstructured," and that appellant was more attentive to one twin than the other. Tr. at 2690-2700. Deborah Matz, who had babysat for appellant in the past, described appellant as depressed and overwhelmed; at one time, appellant distressfully confided that she "didn't like" her daughter Lucie. Appellant also told Matz that she wanted to kill herself and "take them with her." Tr. at 1898. William Gerberick, appellant's former landlord at a previous residence on Park Street, observed a lock and extensive urine damage in Caitlin's bedroom. Both Ruby Miller, Caitlin's paternal grandmother, and Becky Case, the twins' paternal grandmother, noted ongoing cleanliness problems in the house. Case indicated that the twins were "never" without a diaper rash. Anthony Miller, Caitlin's father, recalled an incident where he had pounded on the door for twenty minutes, while he could hear the babies inside. Molly Renner, a friend who had met appellant via an internet chat room, had also stayed at appellant's house, and believed the twins were not well taken care of.
 {¶ 27} Witnesses who had become familiar with appellant via internet chatrooms also took the stand. Kathy Stoller, who noted that appellant once used the screen name "psychoswish", testified that appellant told her about a "sparking outlet" as the possible cause of the fire. Holly Treadwell was another acquaintance from the chat room. She recalled that appellant cried when her ultrasound showed expected twins. Both Bethann Bryant, a former babysitter, and Dawn Beatty, an acquaintance, testified to appellant expressing a desire to take her kids or family "with her."
 {¶ 28} The physical evidence in the case sub judice was largely detailed by the testimony of Captain Tom Smith of the Ashland Fire Department's fire prevention bureau. Smith investigated the scene on the day of the fire, beginning by conducting an overview of the Edgehill Avenue house. He initially observed a "tremendous amount" of cigarette butts and lighters lying about the house, as well as a candle lighter sitting on top of the refrigerator. Tr. at 2290, 2296. Smith found no electrical problems, and the house had apparently been fully rewired just a few years prior to the fire. Id. at 2291. He noticed a working smoke detector, with a good battery and closed cover, on the stairwell leading to the second-floor bedrooms; however, the battery was not connected. Tr. at 2298-2299. The nursery room had smoke damage throughout. Caitlin's room revealed a lot of heat and smoke damage, with actual fire damage. There was damage to the low-nap carpeting in Caitlin's room, which contained the only spot in the house where the wood floor had actually burned. In this area, Smith discovered a football-sized thin glob of melted plastic. Smith also conducted a "hands and knees" search of Caitlin's bedroom, as well as the ground outside the window where firefighters had thrown a smoldering mattress from the room. His search did not reveal any accelerants or materials, such as lighter parts, indicating a source of ignition. Smith ultimately concluded that the fire was "human set." Tr. at 2384.
 {¶ 29} Detective Kim Mager of the Ashland Police Department thereafter commenced a "suspicious fire" investigation. In April and early May 2003, she interviewed appellant on three occasions, revealing a number of inconsistencies. Appellant opined that the fire had started "near an outlet" and indicated that it had been "more relaxing for her" since the fatal fire. Appellant also expressed hope that she and Bursley would now be "closer." In one of the interviews, appellant told the detective that although Caitlin and Lucie had been up all morning on the day of the fire, Julia had been asleep since a 9:00 AM nap. In the third interview, however, appellant stated that all three girls had been up all morning. Appellant also first told the detective that she had checked on the children at 12:45 PM, and they were all asleep, but in a later interview, indicated that Lucie was awake and making audible babbling sounds. She also told the detective at one point that she was a light sleeper, and would hear even Caitlin's feet hitting the floor. Appellant also told authorities she had fed all three children lunch at around noon, but the autopsy of Julia, conducted by Cuyahoga County Deputy Coroner Dr. Erica Armstrong, revealed no stomach contents. Tr. at 2523.
 {¶ 30} Becky Case, the mother of Bob Bursley (and paternal grandmother of the twins) revealed that appellant told her, about two weeks before the fire, that Caitlin had set fire to her baby blanket. Yet Lou Landis, appellant's paternal aunt, who had quilted the blanket, testified that when she saw the fire-damaged item, appellant, with Caitlin standing within earshot, said she did not know how it had been burned.
 Review of Defense Case {¶ 31} Defense counsel in turn called sixteen witnesses; appellant exercised her constitutional right not to testify. Several witnesses, including Amy Jerabek (a social worker and former neighbor), Tanna Gundy (an interventionist at Ashland MRDD), Esther Cordes, and Shirley Fritts, essentially testified that appellant was a good mother, provided an appropriate household for the girls, and did not react in an improper fashion to the tragedy. Kim Bursley, the stepmother of Bob Bursley, recalled that appellant's home was perhaps cluttered, but not unsanitary. Kim also remembered appellant sobbing at Lucie's hospital bedside. Brad Olson, M.D., the twins' pediatrician, opined that his records of treating the girls revealed a lack of any "across the board delays."
 {¶ 32} Another defense witness, Erin Eller, the owner of the Edgehill Avenue house and former landlord to appellant, explained that the disputed former lock on Caitlin's door was not put there by appellant. Reverend Darrell Keyser, appellant's childhood pastor, who was asked by the family to come to Akron Children's Hospital, observed that appellant was displaying grief during the time at the hospital.
 {¶ 33} The defense also called appellant's brother, Bill Roseborough, who, among other things, contradicted some of the prosecution witnesses by recalling that appellant was "overjoyed" at the prospect of having twins. Jacqueline Roseborough, appellant's mother, also took the stand as a defense witness. She denied that Caitlin's room at the Park Street apartment had a urine smell. She also noted that "[i]t seems like all the responsibility [for care of the Edgehill house] fell on Katie." Tr. at 3307. When Jacqueline went to Ashland Samaritan the day of the fire, she observed appellant as disheveled, upset, and crying. Tr. at 3311. During cross-examination, Jacqueline stated that she knew appellant "did not do this." Tr. at 3358. However, although she "believed" that Caitlin started the fire (Tr. at 3363), she also admitted on cross-examination that she had allowed Caitlin, subsequent to the fatal fire, to use a lighter to light a candle on her dining-room table. Tr. at 3363-64. She further indicated she was unaware of the "burned blanket" event that had occurred at appellant's house before the fatal fire. Tr. at 3386.
 {¶ 34} Rick Pletcher, an arson expert, also participated as a defense witness. He was critical of Captain Smith's investigation, opining that the fire scene was not held long enough, that additional agencies should have been consulted, and that more physical evidence should have been secured, such as Caitlin's bed and the entire room's carpeting. Tr. at 3254. He also expressed an opinion, contrary to Captain Smith's investigation, that the fire had indicia of being set by a juvenile, based on the daytime setting, the origin in a child's bedroom, and the origin being a single spot in the house. Tr. at 3551.
 Conclusion {¶ 35} This Court has previously recognized that because of the nature of the crime, proof of arson must often rely heavily upon circumstantial evidence and the inferences one may draw from such evidence. Abon, Ltd. v. Transcontinental Ins. Co.,
Richland App. No. 2004-CA-0029, 2005-Ohio-3052, ¶ 70, citingState v. Funk, Franklin App. No. 00AP-1352, 2001-Ohio-4110. Upon review of the voluminous record in this case as summarized above, we find the jury did not clearly lose its way and create a manifest miscarriage of justice requiring that appellant's conviction be reversed and a new trial ordered.
 {¶ 36} Appellant's First Assignment of Error is therefore overruled.
 II. {¶ 37} In her Second Assignment of Error, appellant maintains the trial court erred when it declined to grant her request for a change of venue. We disagree.
 {¶ 38} A person accused of a criminal offense is entitled to a trial with evidence properly presented to a fair and impartial jury. See Irwin v. Dowd (1961), 366 U.S. 717, 81 S.Ct. 1639,6 L.Ed.2d 751. The trial court must decide in its discretion whether jurors who serve will be able to decide the case solely on the evidence presented. State v. Montgomery (1991),61 Ohio St.3d 410. A trial court must also examine the totality of local circumstances when determining whether to change the venue of a given case. Irwin, supra, at 721.
 {¶ 39} Appellant contends that the "extensive pretrial publicity and pervasive community discussions and sentiments" in the case sub judice prevented a fair and impartial trial being held in Ashland County. Her appellate brief commendably sets forth an exhaustive listing of transcript citations indicating that many of the potential jurors knew about the case from media reports, many had discussed the case with friends, co-workers, acquaintances, or people they encountered in stores, and some were acquaintances, relatives, or co-workers of appellant and her family, the Bursley family (re: Julia and Lucie), or the Miller family (re: Caitlin). Finally, various potential jurors reported discussions that occurred during the voir dire process itself.
 {¶ 40} Nonetheless, a juror need not be totally ignorant of the facts and issues of the case, but can be exposed to publicity if the juror is able to set aside the pre-trial impressions and render a verdict based solely on the evidence presented at trial. See United States v. Johnson (C.A.6, 1978), 584 F.2d 148. As the State sets forth in its response brief, the jurors who ultimately were ultimately seated assured the trial court that either they knew nothing about the case or that they could decide the case solely on the evidence at trial: Mr. Pettit, Tr. at 1359-60, 1408, 1420-21; Mr. Bowles, 1423, 425, 505, 508; Ms. Kelly, 829, 833, 1561-62, 1565, 683-685; Mr. Kratzer, 496-98, 1424, 1476; Mr. Brown, 1558-60, 676, 678; Ms. Collins, 1556-1558, 668, 671; Ms. Roice, 351-355, 1349-1350, 1425; Mr. Fifik, 1549-1550, 651-52; Mr. Fliger, 1525-1531, 563; Ms. Helenthal 553, 558, 1522, 1524, 1525; Mr. Hadley, 1423, 1469, 260-273, 1340-41, 1404-05, 1425, 1457; Ms. Balklin, 1511, 1513, 1516-17, 525-532.
 {¶ 41} Having reviewed the transcript of the extensive voir dire in this matter, and the pertinent rulings in this regard, we conclude the trial court did not abuse its discretion in denying the request for a change of venue.
 {¶ 42} Appellant's Second Assignment of Error is overruled.
 III. {¶ 43} In her Third Assignment of Error, appellant contends the trial court erred in declining to excuse three of the jurors for cause. We disagree.
 {¶ 44} "[T]he selection and qualification of jurors are largely under the control of the trial court and, unless an abuse of discretion is clearly shown with respect to rulings thereon, they will not constitute ground for reversal." State v. Trummer
(1996), 114 Ohio App.3d 456, 461, 683 N.E.2d 392, citing Berk v.Matthews (1990), 53 Ohio St.3d 161, 559 N.E.2d 1301. A juror "* * * ought not to suffer a challenge for cause when the court is satisfied from an examination of the prospective juror or from other evidence that the prospective juror will render an impartial verdict according to the law and the evidence submitted to the jury at the trial." State v. Duerr (1982),8 Ohio App.3d 404, 457 N.E.2d 843, paragraph two of the syllabus.
 Juror Pettit {¶ 45} Juror Pettit advised the court during voir dire that he had once worked in a store with one of the State's witnesses, for a period of two to three years. Tr. at 442. Furthermore, Pettit stated he once experienced a house fire, during which his first thought was to rescue his family members. Tr. at 1407. Regarding pretrial publicity, Pettit said he had read that the original trial judge had recused himself and that appellant had been unable to rescue her children, although police officers were able to "go in and get the children." Tr. at 446, 1444. He expressed that appellant's failure to rescue caused him concern. Tr. at 1444. He indicated that it was "possible" that such a factual scenario might preclude him from being impartial, after stating that he would "have to know more about the circumstances" before he could be sure that the rescue issue would not impact his ability to be fair on the final verdict. Tr. at 1445.
 {¶ 46} Appellant's challenge for cause regarding Pettit was denied. Tr. at 1496. However, before opening statements, Pettit's jury service came up again. Defense counsel also moved to change venue and strike the entire venire. Tr. at 1571. At this point, the court offered to excuse Pettit for cause and place one of the alternates on the jury, even though defense counsel had previously waived his challenges on the four alternates. Tr. at 1585. Defense counsel did not accept this offer by the court absent further voir dire of the alternates, but maintained his for-cause objection regarding Pettit. Tr. at 1589. The court then briefly re-engaged Pettit in voir dire questioning, with the judge stating to Pettit that he "need[ed] a recommitment on your part * * *." Pettit indicated that he could weigh the evidence honestly and set his concerns about the rescue issue aside. Tr. at 1609.
 {¶ 47} Having reviewed the pertinent voir dire portions of the trial transcript, we are unable to find an abuse of discretion by the trial court in seating Juror Pettit.
 Potential Jurors Kiplinger and Fulk {¶ 48} Potential Juror Kiplinger, during voir dire, indicated that he had heard appellant had made a "confession" as a result of police interrogation, and he couldn't "answer yes or no" whether this belief might interfere with his decision of guilt or innocence. Tr. at 417. Potential Juror Fulk stated he had heard that there was "something wrong with [appellant] mentally," and that one of his co-workers called her a "psycho." Tr. at 340. Fulk also initially indicated that he might be more inclined to convict if appellant chose not to testify. Tr. at 345-346.
 {¶ 49} The record in the case sub judice reveals that Kiplinger was later excused via a peremptory challenge by the State (Tr. at 1531); Fulk was later excused via a peremptory challenge by appellant (Tr. at 1535). The Ohio Supreme Court has recognized that "any claim that the jury was not impartial is not focused on the juror excused by the exercise of the peremptory challenge, but rather is focused on the jurors who ultimately sat." State v. Broom (1988), 40 Ohio St.3d 277, 288,533 N.E.2d 682, citing Ross v. Oklahoma (1988), 487 U.S. 81,108 S.Ct. 2273, 101 L.Ed.2d 80. In light of our conclusions regarding Juror Pettit, we find appellant's concerns as to these two potential jurors moot.
 {¶ 50} Based on our review of the record and the examinations of the jurors therein, we find no abuse of discretion in the impaneling of the jury by the trial court.
 {¶ 51} Appellant's Third Assignment of Error is overruled.
 IV. {¶ 52} In her Fourth Assignment of Error, appellant argues the trial court erred and violated her rights to due process and a fair trial by permitting the testimony of a firefighter regarding the nature of soot he observed on appellant's face at the scene. We disagree.
 {¶ 53} The admission or exclusion of evidence rests in the sound discretion of the trial court. State v. Sage (1987),31 Ohio St.3d 173, 180, 510 N.E.2d 343. Our task is to look at the totality of the circumstances in the particular case under appeal, and determine whether the trial court acted unreasonably, arbitrarily or unconscionably in allowing or excluding the disputed evidence. State v. Oman (Feb. 14, 2000), Stark App. No. 1999CA00027. "In general, courts should admit expert testimony whenever it is relevant and satisfies Evid.R. 702." Valentine v.PPG Industries, 158 Ohio App.3d 615, 628, 2004-Ohio-4521, appeal allowed 104 Ohio St.3d 1438, 2004-Ohio-7033, citing State v.Nemeth (1998), 82 Ohio St.3d 202, 207, 694 N.E.2d 1332. But a trial judge must perform a "gatekeeping" role to ensure that expert testimony is sufficiently (a) relevant and (b) reliable to justify its submission to the trier of fact. State v. Wilson,
Perry App. No. 05-CA-5, 2005-Ohio-6201, ¶ 25, citing Kumho TireCo., Ltd. v. Carmichael (1999), 526 U.S. 137, 119 S.Ct. 167,143 L.Ed.2d 238.
 {¶ 54} Evid.R. 702 reads as follows in pertinent part:
 {¶ 55} "A witness may testify as an expert if all of the following apply:
 {¶ 56} "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
 {¶ 57} "(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
 {¶ 58} "(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. * * *."
 {¶ 59} In Miller v. Bike Athletic Co., 80 Ohio St.3d 607,611, 687 N.E.2d 735, 1998-Ohio-178, the Ohio Supreme Court of Ohio, relying on Daubert v. Merrell Dow Pharmaceuticals, Inc.
(1993), 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469, set forth the following four factors for consideration in evaluating the reliability of scientific evidence: "(1) Whether the theory or technique has been tested, (2) whether it has been subjected to peer review, (3) whether there is a known or potential rate of error, and (4) whether the methodology has gained general acceptance." See State v. Ficzeri, Lake App. No. 2004-L-147,2005-Ohio-6073. However, "[t]he test of reliability is flexible and bends according to the particular circumstances of the testimony at issue." Tanner v. Westbrook (C.A. 5, 1999),174 F.3d 542, 547 (citations omitted).
 {¶ 60} In the case sub judice, Kevin Rosser, an Ashland firefighter and paramedic, testified that he had observed large-particle soot on appellant's face and mouth area. When asked by the prosecutor about the difference between large and small particles, Rosser answered that "[t]he larger particles * * * would have come from being there at an earlier stage of the fire. As the fire progresses —." Tr. at 1758. At that point, defense counsel objected and implicitly asked for a Daubert
hearing, asserting that Rosser would be testifying as to "the chemistry of the fire." Id. The trial court declined to hold aDaubert hearing regarding Rosser's "large-particle, early stage" testimony, and allowed Rosser to continue. Id. Appellant presently notes that the prosecutor later twice referred to the type of soot on appellant's face as the evidentiary equivalent of the classic "cherry pie" on the face of a child who has denied eating any pie. See Tr. at 4144, 4145.
 {¶ 61} The pertinent questioning of Rosser by the prosecutor is set forth as follows:
 {¶ 62} "Q. These larger particles of soot that exist — that you say exist at the start of a fire, when they fall on you — you say they're floating in the air?
 {¶ 63} "A. Right.
 {¶ 64} "Q. If you are present when a fire is started and these large particles of soot are in the air, do you feel them when they fall on you?
 {¶ 65} "A. I don't personally feel them due to the fact that I have tons of equipment on, full protective clothing and a breathing SCBA, which is a self-contained breathing apparatus, and that way I can't actually feel them landing on top of me. I can see them floating through the air without any problem at the beginning, but I don't actually feel them falling on top of me.
 {¶ 66} "Q. Do they get on your skin?
 {¶ 67} "A. If you have exposed skin, yeah, they'll land right on top of your hairs. They aren't heavy enough to penetrate your hairs. They'll stick right on top of your hairs. And it's almost like a little film that sits on the hair. It doesn't all make it down to your skin at that time. As the fire gets hotter and hotter, then those particles just go right through your hair follicles and go right into your skin and into your pores as it gets hotter.
 {¶ 68} "Q. If this large-particle soot that exists at the earliest stages of the fire gets on, say, your skin and you go to wipe it, what will happen to that?
 {¶ 69} "A. That's when it smudges and makes a big black mark across your . . .
 {¶ 70} "Q. If you were dealing with small-particle soot from a later stage of the fire and you rubbed your — say your forehead was exposed and you rubbed your forehead, would there be a same smudging?
 {¶ 71} "A. No, it would be something that's already on your skin, and that's the part that you have to scrub off to get off.
 {¶ 72} "Q. When you looked at Rose on that day and you looked at the soot that was on her, was it large-particle soot or was it small-particle soot?
 {¶ 73} "A. It was large-particle soot that she had wiped off on one side and it was smudged on her forehead.
 {¶ 74} "Q. Medically speaking, now, did that have significance to you at that time?
 {¶ 75} "A. That was what I based on wanting to take her to the hospital. If she breathed all that stuff into her lungs, the larger particles, that stuff could eventually get to the part where it would — it may create some edema in her throat and maybe cut off her airway, eventually. If she didn't have trouble breathing yet, she could have a chance of having it later." Tr. at 1760-62.
 {¶ 76} The United States Supreme Court aptly recognized inKumho Tire, supra: "The trial court must have the same kind of latitude in deciding how to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides whether or not that expert's relevant testimony is reliable. * * * [The abuse of discretion] standard applies as much to the trial court's decisions about how to determine reliability as to its ultimate conclusion. * * * [W]hether Daubert's specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." Kumho Tire at 152-153, citingGeneral Elec. Co. v. Joiner (1997), 522 U.S. 136,118 S.Ct. 512, 119 S.Ct. 1167
 {¶ 77} The record in the case sub judice reveals that Rosser is a trained firefighter and paramedic, with nine and-one-half years experience with the Ashland Fire Department and two years experience with the Mifflin-Richland Fire Department at the time of trial. Tr. at 1742. For approximately the most recent five-year period, his main job in the department had been setting training fires in donated structures, often five to ten times per year. Tr. at 1746. Furthermore, Rosser and his crew might typically have lit eight to fifteen separate fires in a single training structure. Tr. at 1760. Upon review, we are unpersuaded that the trial court's decision not to conduct a Daubert
hearing and to allow Rosser's "soot" testimony rose to the level of an abuse of discretion and constituted reversible error.
 {¶ 78} Appellant's Fourth Assignment of Error is therefore overruled.
 V. {¶ 79} In her Fifth Assignment of Error, appellant argues that prosecutorial misconduct deprived her of a fair trial. We disagree.
 State's Theories of the Case {¶ 80} Appellant first claims that the State, while presenting two theories of the case simultaneously, improperly pursued a third theory which the trial court had already limited regarding presentation. Appellant suggests that the State's two "official" theories were that (1) appellant set a fire to kill her children due to depression and being overwhelmed by the demands of motherhood, or that (2) appellant negligently let Caitlin start the fire. However, appellant charges that the prosecutor also impliedly suggested to the jury a third theory, despite a pretrial agreed order not to present medical evidence therefor, wherein appellant allegedly attempted to suffocate Lucie on the day in question, then hurriedly set the fatal fire as a cover-up.
 {¶ 81} Appellant first notes the State "allowed" the jury to review an interview transcript from May 3, 2003, in which the prosecutor asked appellant: "What did you do to Lucie?" The prosecutor also states in the interview: "You know what you did that day. And so do I." Appellant urges that this put before the jury another inference in favor of the suffocation/cover-up theory, and effectively permitted the prosecutor to testify. Further, appellant maintains, the State tried to bolster this third theory by asking the defense arson expert whether an arsonist might start a fire in the afternoon hours "to cover up a crime." Tr. at 3622. The State also asked defense witness Kim Bursley whether she was "aware of all the evidence we have?" Tr. at 3129.
 {¶ 82} A conviction will be reversed only where it is clear beyond a reasonable doubt that, absent the prosecutor's comments, the jury would not have found the defendant guilty. State v.Benge, 75 Ohio St.3d 136, 661 N.E.2d 1019, 1996-Ohio-227. Furthermore, "[i]solated comments by a prosecutor are not to be taken out of context and given their most damaging meaning."Donnelly v. DeChristoforo (1974), 416 U.S. 637, 647,94 S.Ct. 1868, 40 L.Ed.2d 431. Upon review, we find the alleged prosecutorial misconduct regarding the "third theory" did not rise to the level of reversible error as urged by appellant.
 Closing Argument {¶ 83} Appellant recites numerous alleged instances of improper commentary by the prosecutor during closing arguments, including references to appellant's childhood loss of her father, her history of failed relationships, her strained relationship with her mother, her initial unhappiness about becoming pregnant with twins, questions about her smoking habit during pregnancy, and labeling appellant a "duplicitous woman." Appellant also points to the prosecutor's purported flout that "[e]ven an animal fights for [her] babies," and remarks concerning shopping, partying, and sexual activity subsequent to the fire. Appellant also reproves the prosecutor faulting her parenting skills as not demonstrating "the image that all of us have of the little kid that you feed and has spaghetti on its head." Tr. at 4154. Our attention is also directed the prosecutor's characterization of defense counsel as acting mean and "savage" (Tr. at 4132), the alleged mischaracterization of defense expert Pletcher's testimony as to whether the fire was set by a juvenile, and the prosecutor's misstatement that a "police officer with no oxygen" was able to rescue the babies, when technically only Caitlin was rescued by the police.
 {¶ 84} Generally, a prosecutor's conduct at trial is not grounds for reversal unless that conduct deprives the defendant of a fair trial. State v. Loza (1994), 71 Ohio St.3d 61, 78,641 N.E.2d 1082. Upon review, even if we were to find these comments and the additional statements noted in appellant's brief to be improper, we do not conclude the statements prejudicially affected appellant's substantial rights.
 Destruction of Evidence {¶ 85} Appellant finally alleges prosecutorial misconduct based on fire officials' loss or destruction of the melted glob of plastic found near the ignition point of the fire. We note that in Arizona v. Youngblood (1988), 488 U.S. 51,109 S.Ct. 333, 102 L.Ed.2d 281, the United States Supreme Court held that unless a criminal defendant can show bad faith on the part of police officials, failure to preserve potentially useful evidence does not constitute a denial of due process of law. Appellant herein provides no legal authority addressing whether theYoungblood standard applies to this type of prosecutorial misconduct claim, nor does appellant attempt to draw a nexus between the fire department's actions and the duties of the prosecutor under the facts of this case. We thus find no merit in appellant's claim as to the lost or destroyed evidence.
 {¶ 86} We therefore find no reversible error based on the alleged prosecutorial misconduct. Appellant's Fifth Assignment of Error is overruled.
 VI. {¶ 87} In her Sixth Assignment of Error, appellant argues that the State's pursuit of multiple theories of the case (see Assignment of Error V, supra) deprived her of due process of law. We disagree.
 {¶ 88} "[T]he prosecution is entitled to offer differing theories as to what actually transpired in the commission of an offense and is therefore entitled to use its discretion in deciding which charges to level against the defendant." State v.Miller, 96 Ohio St.3d 384, 389, 2002-Ohio-4931, ¶ 30. Appellant, however, couches her argument in terms of fundamental fairness, urging that a prosecutor's job "* * * is not merely to prosecute crimes, but also to make certain that the truth is honored to the fullest extent possible during the course of the criminal prosecution and trial." See U.S. v. Kattar (C.A. 1, 1988),840 F.2d 118, 127.
 {¶ 89} We find no merit in appellant's due process claim under the circumstances of this case. We conclude the jury decision in this case did not result in verdicts on inconsistent counts, as the jury acquitted on involuntary manslaughter (i.e., the theory that appellant recklessly caused the death of the twins as a proximate result of child endangering). Nor does this case raise issues of multiple defendants being separately convicted for the same single offense. Cf., e.g., Smith v.Groose (C.A. 8, 2000), 205 F.3d 1045. Furthermore, "[i]t is not enough for a due process violation that there are discrepancies because of rational inferences drawn from ambiguous evidence, provided that the multiple theories are supported by consistent underlying facts." Sifrit v. State (2004), 383 Md. 116,122-123, 857 A.2d 88.
 {¶ 90} Appellant's Sixth Assignment of Error is therefore overruled.
 VII. {¶ 91} In her Seventh Assignment of Error, appellant contends the trial court erred in declining to sever the misdemeanor count of child endangering. We disagree.
 {¶ 92} "Joinder is liberally permitted to conserve judicial resources, reduce the chance of incongruous results in successive trials, and diminish inconvenience to the witnesses." State v.Schaim, 65 Ohio St.3d 51, 58, 600 N.E.2d 661, 1992-Ohio-31. Crim.R. 14 permits a defendant to sever the charges if consolidation will result in prejudice: "If it appears that a defendant or the state is prejudiced by a joinder of offenses * * *, in an indictment, * * * or by such joinder for trial together of indictments, * * *, the court shall order an election or separate trial of counts, * * *, or provide such other relief as justice requires. * * *"
 {¶ 93} In order to prevail on appeal on a claim that the trial court erred in denying a motion to sever, the appellant has the burden of demonstrating the following three facts: (1) that his rights were prejudiced; (2) that at the time of the motion to sever he provided the trial court with sufficient information so that it could weigh the considerations favoring joinder against the defendant's right to a fair trial; and (3) that given the information provided to the court, it abused its discretion in refusing to separate the charges for trial. Schaim at 59,600 N.E.2d 661, citing State v. Torres (1981), 66 Ohio St.2d 340,421 N.E.2d 1288, syllabus.
 {¶ 94} The crux of appellant's argument on the issue of prejudice is her assertion that the evidence of child endangering presented at trial would not have been admissible in a separate trial for murdering the twins. Appellant's Brief at 28. However, "[i]f the evidence of other crimes would be admissible at separate trials, any `prejudice that might result from the jury's hearing the evidence of the other crime in a joint trial would be no different from that possible in separate trial,' and a court need not inquire further." Schaim, supra., citing Drew v.United States (C.A.D.C. 1964), 331 F.2d 85, 90. As analyzed further in regard to appellant's Ninth Assignment of Error, infra, we find the "other acts" evidence regarding appellant's purported neglect of her children would be admissible in a separate murder trial under Evid.R. 404(B) for purposes of establishing motive; hence, we conclude appellant was not prejudiced by the trial court's decision not to sever the misdemeanor child endangering count.
 {¶ 95} Accordingly, appellant's Seventh Assignment of Error is overruled.
 VIII. {¶ 96} In her Eighth Assignment of Error, appellant contends she was deprived of the effective assistance of counsel at trial. We disagree.
 {¶ 97} Our standard of review is set forth in Strickland v.Washington (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. Ohio adopted this standard in the case of State v. Bradley
(1989), 42 Ohio St.3d 136, 538 N.E.2d 373. These cases require a two-pronged analysis in reviewing a claim for ineffective assistance of counsel. First, we must determine whether counsel's assistance was ineffective; i.e., whether counsel's performance fell below an objective standard of reasonable representation and was violative of any of his or her essential duties to the client. If we find ineffective assistance of counsel, we must then determine whether or not the defense was actually prejudiced by counsel's ineffectiveness such that the reliability of the outcome of the trial is suspect. This requires a showing that there is a reasonable probability that but for counsel's unprofessional error, the outcome of the trial would have been different. Id. Trial counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. State v. Sallie (1998),81 Ohio St.3d 673, 675, 693 N.E.2d 267.
 {¶ 98} Appellant specifically urges that her trial counsel was ineffective for (1) declining to call Caitlin, the surviving child, as a witness at trial, (2) failing to object to the redaction of the audio portion of the videotape shown to the jury, such that the jury watched a "silent video" of Caitlin being unable to use various candle lighters, (3) failure to specifically recite Evid.R. 403 as a basis for numerous defense objections to testimony regarding appellant's mothering capabilities.
 Decision Not to Call Caitlin {¶ 99} Neither side utilized Caitlin as a witness during the guilt phase of the trial.[1] However, during the mitigation phase of the case, defense counsel conducted the following proffer of Caitlin's testimony, questioning her as follows outside the hearing of the jury:
 {¶ 100} "Q. Do you remember when there was a fire at your house?
 {¶ 101} "A. (Nods yes.)
 {¶ 102} "Q. Do you remember that day?
 {¶ 103} "A. Yes.
 {¶ 104} "Q. Tell us what you know about the fire.
 {¶ 105} "A. Well, all I know is that I — my sisters. I know about my sisters. I know about myself and what I did.
 {¶ 106} "Q. Well, tell us about that. You're allowed to.
 {¶ 107} "A. All right. I know that I started the fire; I know that my sisters died; I know that I passed out. And I think that's about all.
 {¶ 108} "Q. How did you start the fire?
 {¶ 109} "A. Lighter.
 {¶ 110} "Q. A lighter. Where did you find the lighter?
 {¶ 111} "A. My mom's room.
 {¶ 112} "Q. And was there anything particular that you started on fire?
 {¶ 113} "A. Like what particular?
 {¶ 114} "Q. Well, was there a puppet or something?
 {¶ 115} "A. Yes.
 {¶ 116} "Q. And what happened when the fire started?
 {¶ 117} "A. I went into my mom's room, I got some water, and then I dumped it at the fire, but nothing happened.
 {¶ 118} "Q. So then what did you do?
 {¶ 119} "A. Well, I ran into my sisters' room. They were crying. One was standing up. I think one was standing — the other one was standing up.
 {¶ 120} "Q. Then what happened?
 {¶ 121} "A. And they were just crying and coughing a lot, and that's about all I remember about it.
 {¶ 122} "Q. And after the fire when you were in the hospital, did you tell people that you were the one that started the fire?
 {¶ 123} "A. Yes.
 {¶ 124} "Q. Did you tell Captain Smith?
 {¶ 125} "A. Yes.
 {¶ 126} "Q. And detective Kim Mager?
 {¶ 127} "A. Who is he?
 {¶ 128} "Q. Kim Mager.
 {¶ 129} "A. Oh.
 {¶ 130} "Q. She's a woman.
 {¶ 131} "A. I think.
 {¶ 132} "Q. Yeah. Okay. And has anybody been telling you that you're wrong about you starting the fire?
 {¶ 133} "A. Everybody just says it was my mommy. That I'm telling everybody it was me.
 {¶ 134} "Q. What about Dr. Marikis, does he say it was your mommy?
 {¶ 135} "A. Well, he said it was my mommy, and I'm like, no, it was me.
 {¶ 136} "* * *
 {¶ 137} "Q. Well, let me ask you one other question. You really think you started the fire, don't you?
 {¶ 138} "A. (Nods yes.)" Tr. at 4596-4597.
 {¶ 139} Appellant particularly contends that Caitlin's testimony became "truly imperative" after a State's rebuttal witness, psychologist Dennis Marikis, Ph.D. testified that Caitlin's statements regarding the fire had changed in "core" ways, and that a child could maintain a lie for more than a year. Appellant's Brief at 30; Tr. at 3983.
 {¶ 140} The mere existence of Caitlin's post-guilt phase proffer in this case is intriguing, given that "[n]either the United States Constitution nor the Constitution of Ohio requires that residual doubt be considered as a mitigating factor." Statev. Green, 90 Ohio St.3d 352, 360, 2000-Ohio-182, citingFranklin v. Lynaugh (1988), 487 U.S. 164, 108 S.Ct. 2320,101 L.Ed.2d 155. Nonetheless, "reviewing courts * * * must keep in mind that different trial counsel will often defend the same case in different manners." State v. Samatar, 152 Ohio App.3d 311,787 N.E.2d 691, 2003-Ohio-1639, ¶ 88. The record furthermore indicates that subsequent to appellant's proffer of Caitlin's testimony, the State read a counter-proffer into the record outside of the presence of the jury, indicating that Caitlin had also said, in contrast, that "they're" trying to blame her for the fire, that she forgave appellant for setting it, and that she thought appellant had set the fire because she wanted to "make angels" of her twin daughters. Tr. at 4736-4737. See also, 4310, 4598, and 4810. We therefore surmise, based on the present record, that defense counsel chose not to subject Caitlin to the State's cross-examination by calling her as a defense witness during the guilt phase, and we find such a decision was within the parameters of reasonable trial strategy, even in light of Dr. Marikis's rebuttal testimony.
 Silent Videotape {¶ 141} During the direct examination of Rick Pletcher, the defense arson expert, defense counsel played a State-prepared videotape of Caitlin being asked by Captain Smith to light numerous candle lighters. Tr. at 3604. The tape shows Caitlin being unable to work the lighters, but the audio portion, which the trial court redacted on hearsay grounds, would have allowed the jurors to hear Caitlin indicate that none of the lighters was identical to the one she had earlier lit. However, even a questionable trial strategy does not require a finding of ineffective assistance of counsel. See, e.g., State v. Clayton
(1980), 62 Ohio St.2d 45, 49, 402 N.E.2d 1189. In this situation, even the silent tape presentation would have buttressed Pletcher's defense opinion that Caitlin was not given sufficient time to properly light the candle lighters in Captain Smith's "test," and we conclude this decision by trial counsel also fails to meet the definition of ineffective assistance.
 Evid.R. 403 {¶ 142} Appellant next challenges trial counsel's failure to recite Evid.R. 403(B) as a basis for objecting to allegedly prejudicial testimony. Evid.R. 403(B) grants a court discretion to limit questioning if the "probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence."
 {¶ 143} Appellant specifies the following testimonial elicitations as examples: (1) Appellant had sex with a man she met via an internet chat room within three weeks after the fire and did not come home a few nights during that period (Tr. at 2731); (2) appellant called herself a "hottie" shortly after the fire, based on her recent weight loss (Tr. at 2786); (3) she lied about her reason for not visiting Caitlin on one occasion after the fire (Tr. at 4147 (sic)); (4) she failed to pay her babysitter (Tr. at 2709); (5) she failed to show up for work consistently in 2001 (Tr. at 2710); (6) she did not go to church anymore (Tr. at 2046); (7) she enjoyed playing pool (Tr. at 2734); and (8) there was a five-pound bucket of empty beer cans in her house (Tr. at 2064).
 {¶ 144} It is well-settled that trial tactics or strategies are viewed with the presumption that effective legal counsel was rendered. State v. Nash (March 27, 2000), Stark App. No. 1999CA00197, citing State v. Bradley (1989), 42 Ohio St.3d 136,144, 538 N.E.2d 373. Furthermore, "[b]ecause `objections tend to disrupt the flow of a trial, [and] are considered technical and bothersome by the fact-finder,' Jacobs, Ohio Evidence (1989), at iii-iv, competent counsel may reasonably hesitate to object * * *." State v. Jackson, Cuyahoga App. No. 86105,2006-Ohio-174, ¶ 88, citing State v. Campbell,69 Ohio St.3d 38, 53, 1994-Ohio-492. We nonetheless note that defense counsel did object, at least in general terms, in several of the above instances. Upon full review, we are unpersuaded that appellant was prejudiced in this regard by her trial counsel's performance. Strickland, supra.
 {¶ 145} We therefore find no reversible error on grounds of ineffective assistance of counsel. Appellant's Eighth Assignment of Error is overruled.
 IX. {¶ 146} In her Ninth Assignment of Error, appellant argues the trial court erred and violated her right to due process of law by permitting alleged character evidence at trial. We disagree.
 {¶ 147} The admission or exclusion of evidence rests in the sound discretion of the trial court. State v. Sage (1987),31 Ohio St.3d 173, 180, 31 OBR 375, 510 N.E.2d 343. As a general rule, all relevant evidence is admissible. Evid.R. 402. Our task is to look at the totality of the circumstances in the particular case and determine whether the trial court acted unreasonably, arbitrarily, or unconscionably in allowing the disputed evidence. See State v. Oman (Feb. 14, 2000), Stark App. No. 1999CA00027.
 {¶ 148} Evid.R. 404(A) provides that evidence of a person's character is not admissible to prove the person acted in conformity with that character. Evid.R. 404(B) sets forth an exception to the general rule against admitting evidence of a person's other bad acts. The Rule states as follows: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."
 {¶ 149} Appellant specifically challenges the following alleged character and "other acts" evidence from the transcript: (1) Caitlin's paternal grandmother, Ruby Miller's, explanation that appellant used the internet screen name "psychowitch" or "psychoswish" because she had called herself "psychobitch" five or six years earlier; (2) Ruby's response to a question concerning Caitlin's excessive time spent at Ruby's house, approximately three years before the fire, to the effect that appellant "didn't want to have to bother" with Caitlin; (3) Lou Landis's recollection that the children were often hungry and normally "needed clean clothes on" when she visited; (4) Molly Renner's observations that the twins "weren't very well taken care of," that Caitlin "kind of did whatever she wanted," and that there was no food in the house; (5) Michelle Mizda's concern that appellant did not talk about the fire during their discussions at the hospital; and (6) Bethann Bryant's testimony that she had observed appellant showing favoritism to Julia vis-á-vis Lucie and not responding when the children were crying, but continuing to "play on the computer or watch TV."[2]
 {¶ 150} Appellant maintains that such testimony tended to establish the negative character trait of inadequate parenting, and that the prosecution encouraged the use of this evidence in support of the murder counts, beyond the child endangering aspects of the indictment. An analogous question was presented inState v. Thompson (Sept. 23, 1997), Franklin App. No. 96APA12-1660, involving a mother's appeal of her conviction for murdering her infant daughter. At trial in that case, the State introduced evidence of the mother's "poor relationship" with her child, including "the lack of love, care, attention and concern exhibited by defendant" toward her. Id. In addressing the mother's challenge on appeal, the Tenth District Court observed: "This evidence was offered as part of the immediate background of the crime alleged and to prove that defendant, a young, single, uneducated, poor mother was so ill-equipped intellectually, emotionally and financially to cope with the pressures and stresses involved in providing and caring for two children under the age of two that she was driven to commit a desperate act. The challenged testimony arguably is so closely and logically related to the act for which defendant was charged as to demonstrate that defendant had both a motive and the intent to purposely cause her daughter's death." Id.
 {¶ 151} Upon review in the case sub judice, we reach a similar conclusion and find appellant has failed to demonstrate an abuse of discretion in regard to the evidentiary decisions of the trial court under Evid.R. 404. A significant portion of the State's theory of the case was that appellant was overwhelmed by and resentful of the task of raising three young children with little emotional support from her live-in boyfriend, and that a desire to alleviate such a situation became a motive for the charged offenses of arson and murder.
 {¶ 152} Accordingly, appellant's Ninth Assignment of Error is overruled.
 X. {¶ 153} In her Tenth Assignment of Error, appellant maintains the trial court erred in assessing costs of $23,270.10 against her. We disagree.
 {¶ 154} In State v. White, 103 Ohio St.3d 580,2004-Ohio-5989, 817 N.E.2d 393, the Ohio Supreme Court held that a trial court may assess court costs against an indigent defendant convicted of a felony as part of the sentence, and that the clerk of the court of common pleas may attempt to collect the costs from the indigent defendant. Although in State v. Smoot,
Franklin App. No. 05AP-1042005, 2005-Ohio-5326, the Tenth District Court of Appeals held that a trial court erred by subsequently imposing court costs in its judgment entry without having imposed such costs in appellant's presence, the trial court in the case sub judice held the entry for two weeks after the sentencing hearing at appellant's request. During that interim period, appellant made no request for a hearing on court costs. Under these circumstances, we find no reversible error in the assessment of costs against appellant.
 {¶ 155} Appellant's Tenth Assignment of Error is therefore overruled.
 {¶ 156} For the reasons stated in the foregoing opinion, the judgment of the Court of Common Pleas, Ashland County, Ohio, is hereby affirmed.
Wise, P.J. Gwin, J., and Farmer, J., concur.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Court of Common Pleas of Ashland County, Ohio, is affirmed.
Costs to appellant.
[1] By this time, Caitlin had turned six years old.
[2] {¶ 1} Appellant concedes that defense counsel did not object to some of the above challenged testimony. It is well-established that an appellate court will generally not consider any error which a party complaining of the trial court's judgment could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court. State v. 1981 Dodge Ram Van
(1988), 36 Ohio St.3d 168, 170, 522 N.E.2d 524. However, we have chosen to address the entire argument in the interest of judicial economy. Accord State v. Tarver, Stark App. No. 2002CA00394,2003-Ohio-6840.