The STATE of Ohio, Appellee,

v.

TRUMMER, Appellant.

[Cite as *State v. Trummer* (1996), 114 Ohio App.3d 456.]

Court of Appeals of Ohio,
Seventh District, Columbiana County.

No. 95–CO–15.

Decided Sept. 30, 1996.

*Robert L. Herron*, Columbiana County Prosecuting Attorney, and *Timothy J. McNicol*, Assistant Prosecuting Attorney, for Appellee.

*Melody Calhoun*, for Appellant.

JOSEPH E. O'NEILL, Presiding Judge.

The defendant-appellant appeared in the trial court charged with rape in violation of R.C. 2907.02(A)(2). Following trial to a jury, a verdict of guilty was returned and sentence was imposed. A notice of appeal was directed to this final judgment of the trial court.

The first assignment of error concerns itself with matters that occurred during the voir dire of the jury panel.

The trial judge conducted the voir dire to a great extent. Among the panel was a person named Keefer. During the voir dire, the trial judge read the indictment to the panel. He then asked the panel:

"Now, first of all, do any of you—does that bring any bring any recollection of—there's been some, obviously like any criminal case there's been some accounts of prior proceedings in the newspapers. Do any of you have any prior knowledge of this incident from what I have told you about it? Anybody reading about it in the paper, hearing about it at work? Mr. Johnson?

"MR. JOHNSON: Yeah, I read about it in the paper.

"THE COURT: Okay, do you recall when and what you read?

"MR. JOHNSON: No, not really. Not too much, just something I read.

"THE COURT: Okay. Do you recall what—what it was that you read at that time?

"MR. JOHNSON: No, not really.

"THE COURT: Anyone else? Or hear about it from word of mouth, at work, on the street, at the beauty shop, barber shop, or any place like that? Mrs. Keefer?

"MS. KEEFER: I read about it, and the name meant something to me because my mother-in-law was a real good friend, I think the grandmother. And uh, I knew the older Mrs. Trummer, you know, and uh, the name itself. And then I knew the name because of Mrs. T's Restaurant in Washingtonville.

"THE COURT: Okay.

"MS. KEEFER: And I'm from Washingtonville, I mean, I was raised in Washingtonville, I don't live there now. But the name meant something to me.

"THE COURT: So, you have some prior contact with the Trummer family from Washingtonville basically?

"MS. KEEFER: Yeah, I knew of them.

"THE COURT: And when you saw this in the paper—

"MS. KEEFER: —(interposing)—Uh huh (indicating yes.)

"THE COURT: That, you kind of connected those two.

"MS. KEEFER: Uh huh (indicating yes.)

"THE COURT: Okay. Did you, first of all, did you recall any specifics about what the newspaper article said about this case?

"MS. KEEFER: I recall that I think there was two victims.

"THE COURT: All right.

"MS. KEEFER: And one of them was a younger girl.

"THE COURT: All right.

"MS. KEEFER: And I was really concerned because, I mean it bothered me because my sister had been raped.

"THE COURT: Okay.

"MS. KEEFER: Years ago.

"THE COURT: All right. Now, your dealings, or your knowledge of the Trummer family, is that favorable or unfavorable? I mean, is that going to influence your verdict—your decision some how?

"MS. KEEFER: No, I just knew the grandmother.·

"THE COURT: Okay.

"MS. KEEFER: She was a sweet person."

At a later point, during the voir dire, a member of the panel asked for the judge's attention:

"MR. TRENKELBACH: Judge?

"THE COURT: Yes.

"MR. TRENKELBACH: Could I ask a question?

"THE COURT: Go ahead.

"MR. TRENKELBACH: Uh ... a few years ago, I don't know the particular man here, but there was a case, there was a circus in town, or something, it was quite a few years ago, and there was a Trummer involved in some sort of a knifing or something. I just happen to think of it.

"THE COURT: Okay, were you—

"MR. TRENKELBACH: —(interposing)—but I know if it was this individual, just the name, that's all.

"THE COURT: The name, you read about it in the paper or something?

"MR. TRENKELBACH: No, word—by mouth, ha, ha, ha.

"THE COURT: Okay.

"MR. TRENKELBACH: Somebody said something and that was it.

"THE COURT: Okay.

"MR. TRENKELBACH: But I don't know the individuals, or anything.

"THE COURT: Okay. Just that it, all that rings a bell is the last name?

"MR. TRENKELBACH: Yeah."

Subsequently, Keefer was excused for cause. Trenkelbach remained as a juror for the trial.

The trial judge administered the oath to the panel. After administering the oath, he gave some pretrial instructions to the jurors. The prosecutor gave his opening statement and appellant gave his opening statement, after which the trial judge made the following statement:

"Okay. Let the record reflect that at the end of the morning break, before we continue the seating of the jury Mr. Powers [counsel for appellant] approached the bench to make a motion for a mistrial based on one of the statements of one of the jurors concerning there being victims in this matter. And I overruled that motion. And at this time I will let you renew that motion, Mr. Powers, or spread it more fully on the record, however you want to do it."

The judge overruled the renewal of the motion. A motion for a mistrial is untimely prior to the jury being impaneled. The correct method for correcting any irregularities prior to the jury being sworn is a motion to dismiss the entire jury panel. Regardless, the selection and qualification of jurors are largely under the control of the trial court and, unless an abuse of discretion is clearly shown with respect to rulings thereon, they will not constitute ground for reversal. *Berk v. Matthews* (1990), 53 Ohio St.3d 161, 559 N.E.2d 1301. Where a trial court is vested with such authority, reversal on appeal is justified only if its exercise thereof constitutes an abuse of discretion. *Martin v. Martin* (1985), 18 Ohio St.3d 292, 294–295, 18 O.B.R. 342, 343–344, 480 N.E.2d 1112, 1114. In *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 173, 404 N.E.2d 144, 149, the applicable standard of review was defined as follows:

"The term 'abuse of discretion' connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable."

When applying this standard, an appellate court is not free to substitute its judgment for that of the trial judge. *Kunkle v. Kunkle* (1990), 51 Ohio St.3d 64, 67, 554 N.E.2d 83, 87. The foregoing rationale is as applicable to decisions of the trial court to disqualify a single prospective juror as to decisions to dismiss the entire panel.

We have reviewed the entire voir dire and find that the trial judge conscientiously and extensively inquired of the remaining prospective jurors as to their ability to sit fairly and impartially and he was obviously satisfied that they could do so. Under this set of facts, we do not find that the trial judge's attitude was unreasonable, arbitrary or unconscionable and, accordingly, we do not find that there was error in denying the motion for a mistrial or the subsequent motion to set aside the panel.

Another portion of this first assignment of error deals with unresponsive testimony by two witnesses indirectly referring to prior criminal problems of the appellant.

Angela Pritchard was a witness called by the prosecution. As a part of her direct testimony, the following colloquy took place:

"Q. Okay, and then—then what was done with Jennifer?

"A. Um ... the cops asked her some questions. And then my mom pulled in, and then he went outside—the cop went outside. I'm not sure what cop it was, went outside and talked to my mom, and then they both walked back in the house. And he told my—he asked my sister to tell my mom what happened.

"Q. Okay. Based upon that, what did your mom do?

"A. Um ... she was talking to my sister about what happened, and she said that she wanted to take her to the emergency room, after the cop had told us that he just got out of jail."

There was no objection and there was no further pursuit of this statement relative to imprisonment.

Laura Ann Trummer was called as a witness by the prosecution and, during redirect examination, the following dialogue occurred:

"Q. How long have you known Doug?

"A. Um ... well, I guess I've known him since me and Travis have been going out, since '86.

"Q. * * *And during that period that you've known him, would you say that he has a steady, or a regular employment history?

"A. Uh, since he got out—when he got out of jail—

"MR. POWERS: —(interposing)—objection—(interposing)—he's worked.

"THE COURT: Well, sustained. The answer is ordered stricken, and the jury instructed to disregard it. The question is sustained, the objection, too. Put another question."

■ Evidence which tends to show that an accused has committed another crime, wholly independent of the offense for which he is on trial, is generally inadmissible. *State v. Curry* (1975), 43 Ohio St.2d 66, 68, 72 O.O.2d 37, 38, 330 N.E.2d 720, 723. The *Curry* court cited a benchmark of the American criminal justice system as follows:

"A hallmark of the American criminal justice system is the principle that proof that the accused committed a crime other than the one for which he is on trial is

not admissible when its sole purpose is to show the accused's propensity or inclination to commit crime." *Id.* at 68, 72 O.O.2d at 38, 330 N.E.2d at 723.

 It certainly cannot be said that the uncalled-for statements of the two witnesses, as to the appellant getting out of jail, were in any way presented solely to show the appellant's propensity or inclination to commit crime. As to the one witness, the trial judge sustained the objection and gave a curative instruction to the jury. As to the other witness no objection was made and, accordingly, any error that might have arisen from that utterance was waived. During his general instructions to the jurors at the close of evidence, the trial judge instructed as follows:

"Any answers or statements to quest—answers to questions or any statements made that I ordered stricken, or that I instructed you to disregard, or to which I sustained an objection are also not evidence, and must be treated by you as if you did not hear those things."

Considering the intensity of the voir dire, the cautionary instruction by the trial judge and the general instructions by the trial judge, it is our conclusion that these two unfortunate remarks by the two witnesses did not deny appellant a fair trial nor did they in any way motivate an erroneous verdict.

The first assignment of error is found to be without merit.

In his second assignment of error, appellant complains that his constitutional rights were violated when the court refused to allow him to introduce scientific evidence of semen which could not have been his and further refused to allow him to cross-examine the alleged victim and other witnesses regarding the semen.

During a pretrial hearing, the following discussion took place between the judge, the prosecutor and counsel for the defendant-appellant, Attorney Powers:

"THURSDAY, FEBRUARY 9, 1995

"MORNING SESSION, 11:45 A.M.

"THE COURT: This matter is 94–CR–254, which I have set today for the hearing required under Revised Code Section 2907.02(E), the so-called Rape Shield Statute. And I would like to hear from either counsel as to what evidence they may intend to offer that we should discuss that might fall under the auspices of that statute. Mr. McNicol, do you have any evidence of specific instances of the defendant's prior sexual activity, opinion evidence, or reputation evidence of his prior sexual activity, that, uh, you intend to introduce?

"MR. McNICOL: No, your Honor.

"THE COURT: Mr. Powers?

"MR. POWERS: Your Honor, we have no, no such evidence to introduce in regard to the Sarah Havelock charge; however, as indicated off the record I did receive a supplement to discovery yesterday. There is an indication that the semen that was found on the clothes of Jennifer Pritchard was not the defendant's, to a hospital and claimed that she had been raped, and claimed that Mr. Trummer did it, but—and frankly, there's a statement by Mr. Trummer that he had consensual sex with Jennifer Pritchard on the day in question. But she goes to the hospital, an examination is done, they find no, no gross indications of an attack. Through the forensics we find out that she apparently had sex with someone other than Mr. Trummer, perhaps in addition to Mr. Trummer. We don't know whether the doctor is going to testify about things that he observed that relate to Mr. Trummer's activity with her, or someone else out in the world's activity. Certainly, we should be permitted to inquire. She claims that Mr. Trummer—

"THE COURT: —(interposing)—on what—on—where was the semen found?

"MR. POWERS: On her panties.

"THE COURT: And these were seized, or turned over for evidentiary purposes when?

"MR. POWERS: Uh ... the night of the, the very night of the alleged incident. She reported to the hospital within hours, and uh, I—I know I recall seeing 6 a.m. as the time on the report, but I believe she was there substantially before that.

"THE COURT: Mr. McNicol.

"MR. McNICOL: Your Honor, it's been the victim's—the alleged victim, Jennifer Pritchard's, statement throughout this ordeal that she has never had, except for the incident in question, any sexual—engaged in any sexual conduct whatsoever with Mr. Trummer. And furthermore it has been her statement, and it will be her testimony next week that during the alleged sexual conduct at issue in this case, Mr. Trummer did not ejaculate. So, therefore, I would submit that the evidence as to the lack of semen, and Mr. Trummer being the semen source, is purely consistent with her statements, and will be consistent with her testimony.

"THE COURT: Well, I'll have to—I'll have to give the matter some consideration. Frankly, I may have to wait until I have a fuller understanding of the evidence before I can rule as to when—whether or not any evidence is admissible, or not. And uh, at least tentatively I'll have to think about it, and either if I can't make a ruling, or decide I should not make a ruling until I have heard some of the evidence in the case to see how the facts of the case develop before I make a

decision, and I'll let you guys know that tomorrow or the first thing Monday morning then. Yes, okay."

Subsequently, during a break in the prosecution's case, there was a more comprehensive discussion relative to the semen issue.

"TUESDAY, FEBRUARY 14, 1995

"MORNING SESSION, 9:00 A.M.

"THE COURT: Before I begin the proceeding, Mr. Powers, I understand you wanted to make a—a proffer pursuant to my Rape Shield ruling?

"MR. POWERS: That is correct, Your Honor. Yesterday afternoon Denise Cargo testified, who is a forensic scientist at the BCI Lab in Richfield. If permitted I would have questioned her about certain evidence that she had examined out of this case. Namely, the panties, or underwear of the alleged victim in this case. If permitted the evidence would have shown that the witness received as part of the rape kit in this particular case the panties or underwear worn by the alleged victim to the hospital. The evidence also would have shown that the semen and/or saliva stains in the crotch of those panties could not have come from the defendant in this case. The semen and/or saliva came from someone who is a secretor, as she described in her testimony, and the testimony would further indicate that Mr. Trummer is not a secretor.

"THE COURT: Mr. Powers, did you want to mark for purposes of the record in that proffer a copy of her report?

"MR. POWERS: Uh ... yes, Judge. (Whereupon, the Reporter marked for purposes of identification as Defendant's Exhibit A, being a copy of Denise Cargo, of BCI, report.) (Whereupon, the Reporter marked for purposes of identification as Defendant's Exhibit B being letters from the Prosecutor's Office to witnesses.)

"THE COURT: And I want to explain a little bit further my ruling now that I have heard some of the evidence. I'm still excluding the evidence based on my prior ruling, and the case of *State of Ohio v. Smith,* 34 Ohio App. 180, which is a 1989 Richland County case. The State did not offer any evidence of semen for any purposes of identifying this defendant as the perpetrator of the offense, or to show that the sexual assault had taken place. To me there is only two purposes of introducing evidence of semen as relevant to an issue in a rape case, and then to question the origin of that semen; one is to show that the intercourse actually took place, and therefore, the rape took place; or if there is a genetic match, or blood match to identify the defendant. If the State doesn't offer that, the semen on those issues, the only reason the defendant can offer it would be to question the identification of the defendant. But this defendant has denied that the sexual conduct even took place, and based on the evidence to date, that any rape could

have taken place that evening. There isn't any question of trying to identify the defendant, or that the actual events took place, therefore, in my opinion the use of the introduction of the semen would be only to test the credibility or to impeach the victim, and has little probative value and if it has any probative value, is outweighed by the prejudicial and inflammatory nature of the evidence, and therefore, it is excluded."

The proffered defendant's Exhibit A was a report from the State Bureau of Criminal Identification and Investigation. This report indicated that appellant had a blood type O and was a nonsecretor. R.C. 2907.02(D) reads as follows:

"Evidence of specific instances of the victim's sexual activity, opinion evidence of the victim's sexual activity, and reputation evidence of the victim's sexual activity shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender, and only to the extent that the court finds that the evidence is material to a fact at issue in the case that its inflammatory or prejudicial nature does not outweigh its probative value.

"Evidence of specific instances of the defendant's sexual activity, opinion evidence of the defendant's sexual activity, and reputation evidence of the defendant's sexual activity shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or disease, the defendant's past sexual activity with the victim, or is admissible against defendant under section 2945.59 of the Revised Code, and only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value."

In *State v. Ferguson* (1983), 5 Ohio St.3d 160, 5 O.B.R. 380, 450 N.E.2d 265 the Supreme Court stated in paragraph two of the syllabus:

"R.C. 2907.02(D) will render inadmissible evidence of the rape victim's sexual activity with one other than the accused where the evidence: does not involve the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender; is offered simply to impeach the credibility of the victim; and is not material to a fact at issue in the case."

In the case at hand, there was no evidence of the origin of the semen in question, there was no fact at issue relative to the semen in question and, very obviously, the proffered evidence was to be presented simply to impeach the credibility of the victim. Of further import to disposition of this assignment of error is the fact that appellant, in a statement given to the police and admitted into evidence, had admitted to the police that, on the night of the alleged rape, he had had sexual relations with the victim.

This second assignment of error is found to be without merit.

The third assignment of error contends that the introduction by the state of improper, irrelevant and prejudicial evidence of alleged bloodstains and the lack of timely discovery to the defendant regarding exculpatory evidence denied the defendant a fair trial and due process.

■ The state was developing facts that the alleged victim was assaulted by appellant while she was a passenger in his car. Allegedly, he punched her in the face while wearing brass knuckles, causing some bleeding. The state presented as a witness Denise M. Cargo, a forensic scientist with the Ohio Bureau of Criminal Identification and Investigation. Upon review, one wonders why this witness was presented. This witness testified that she had examined eleven different items which were removed from the defendant's car, each of which contained some kind of a stain. Of all the items examined by her, only three were, in her opinion, bloodstains. This expert's testimony was summed up during cross-examination:

"Q. So, at this point, other than saying, 'Yes, that's human blood,' you really can't say who it came from in the world?

"A. That's correct.

"Q. Okay. For all you know it could have been from Douglas himself.

"A. Yes, that's correct."

Very obviously, the evidence that came from this witness could not have had any effect upon the determination or decision by the jury.

■ At a hearing before the judge, on February 9, 1995, counsel for the appellant stated to the judge:

"I did receive a supplement to discovery yesterday. There is an indication that the semen that was found on the clothes of Jennifer Pritchard was not the defendant's, and the defendant can be excluded as the person involved in that sexual encounter."

Apparently, it is this part of late discovery that appellant complains of. Crim.R. 16(E)(3) reads as follows:

"*Failure to Comply.* If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances."

There was no complaint raised with the trial judge by trial counsel and we assume that counsel did not consider the supplemental discovery to justify a continuance or prohibit the prosecutor from introducing it in evidence.

Accordingly, this third assignment of error is found to be without merit.

The fourth assignment of error complains that the trial court's failure to instruct the jury on the lesser included offense of sexual battery was an abuse of discretion.

R.C. 2945.74 reads as follows:

"The jury may find the defendant not guilty of the offense charged, but guilty of an attempt to commit it if such attempt is an offense at law. When the indictment or information charges an offense, including different degrees, or if other offenses are included within the offense charged, the jury may find the defendant not guilty of the degree charged but guilty of an inferior degree thereof or lesser included offense.

"If the offense charged is murder and the accused is convicted by confession in open court, the court shall examine the witnesses, determine the degree of the crime, and pronounce sentence accordingly."

Appellant had requested the court to instruct the jury on a lesser included charge of sexual battery. The court denied this request:

"Overruled. Um, I have decided not to give the Sexual Battery, lesser included offense based on the case I have previously cited, *State v. Wilkins*, 64 Ohio St.2d 382, 415 N.E.2d 303. In my opinion, there is [*sic*] two completely different stories here, the defendant completely denies any intercourse with the victim the night of the incident, leaving the victim's testimony solely that she was forced to have sex by—with him when he did so purposely and I think that's— since the jury can only come to one or—I think the jury can only come to one of two conclusions, so, I will not give the Sexual Battery charge."

A jury is instructed to consider a lesser included offense only if it is unable to agree unanimously that a defendant is guilty of a particular offense and if there has been evidence presented relative to a lesser included offense. *State v. Thomas* (1988), 40 Ohio St.3d 213, 533 N.E.2d 286. The appellant came to trial charged with a violation of R.C. 2907.02(A)(2), which reads:

"No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."

The prosecution presented evidence that appellant had engaged in sexual conduct with the victim when he purposely compelled the victim to submit by force.

R.C. 2907.03(A) states that sexual battery occurs when a person engages in sexual conduct with another when:

"(1) The offender knowingly coerces the other person to submit by any means that would prevent resistance by a person of ordinary resolution."

There was no evidence presented at trial that coercion other than force was used and, accordingly, the trial court was not required to give an instruction as to the lesser included offense.

This fourth assignment of error is found to be without merit.

The fifth assignment of error contends that appellant's right to a fair trial was prejudiced by improper cross-examination of a defense witness.

 Donald A. Shephard was called as a witness by the appellant. During cross-examination of Shephard, the following dialogue took place:

"Q. Did you ask Jennifer if she wanted to do something?

"A. No.

"Q. If she wanted to go somewhere?

"A. No. I was going home.

"Q. Do you recall asking her if she wanted to go to a coke party?

"A. No."

There was no objection to the question or answer. Shepherd testified about meeting the alleged victim on October 22, 1994. He, appellant and the alleged victim had traveled from Washingtonville to Salem and back on that night. It could almost be said that any testimony by Shephard had no relevancy to the case at all since the alleged crime occurred on October 24, 1994. Testimony put forth by Shephard could not be classified as helping the defendant or the prosecution in any way.

Accordingly, we assign no merit to this fifth assignment of error.

 The sixth assignment of error complains that appellant's right to a fair trial and due process was substantially prejudiced by the chilling effect of letters sent by the prosecution to potential witnesses.

Appellant brought to the attention of the trial judge his Exhibit B. This Exhibit B contains six letters sent by the prosecution to various prospective witnesses in the case. The letter informed each of the witnesses that a private investigator had been appointed by the court in behalf of the appellant. The letter went on to state:

"I would anticipate that Mr. Edgell or one of his employees will be contacting you concerning your knowledge of this case. As an independent witness in this

matter, you have the right to decide whether or not you wish to talk to any member of the defense team. You do not need to talk with them if you do not want to. However, please do not interpret this to mean that the Prosecutor's Office is discouraging you from talking with the defense.

"If you so choose to talk with a representative of the defense team, we simply request that you permit a representative of our staff to be present during any interview. However, no one from the Prosecutor's Office has to be present if you do not want them to be."

A letter such as this could have a chilling effect upon the ability of a defendant in a criminal case to properly prepare a defense. However, the defense did not establish that testimony by any of the witnesses was affected by the letter to such an extent that the witnesses' testimony would be different in both form and substance and, thus, denied appellant his right to a fair trial.

We find no prejudicial error under this sixth assignment of error.

The seventh assignment of error complains that appellant should have been discharged due to the failure of the state to bring him to trial within the time constraints required by R.C. 2945.71(C).

R.C. 2945.71(C) reads as follows:

"A person against whom a charge of felony is pending:

" * * *

"(2) Shall be brought to trial within two hundred seventy days after his arrest.

" * * *

"(E) For purposes of computing time under divisions (A), (B), (C)(2), and (D) of this section, each day during which the accused is held in jail in lieu of bail on the pending charge shall be counted as three days. * * *"

On November 10, 1994, appellant was stopped for a traffic offense in Critidon County, Arkansas. The fact that he had been indicted and was wanted for the crime involved in this case was discovered by the Arkansas authorities by resort to. computer information. The defendant waived extradition and was returned to Ohio on November 20, 1994. He remained in jail until his trial began on February 13, 1995. The matter of timely trial was not raised with the trial judge. R.C. 2945.73(B) reads as follows:

"Upon motion made at or prior to the commencement of trial, a person charged with an offense shall be discharged if he is not brought to trial within the time required by sections 2945.71 and 2945.72 of the Revised Code."

Speedy trial provisions are not self-executing but must be asserted by a defendant in a timely fashion to avoid such rights being waived. *Partsch v.*

*Haskins* (1963), 175 Ohio St. 139, 23 O.O.2d 419, 191 N.E.2d 922. The *Partsch* court, at 140, 23 O.O.2d at 420, 191 N.E.2d at 923, stated:

"Thus, in order for an accused to procure his release on the basis of a denial of his right to a speedy trial, he must show affirmative action on his part to secure a speedy trial." See, also, *State v. Dumas* (1990), 68 Ohio App.3d 174, 587 N.E.2d 932.

Additionally, R.C. 2945.73(B) very specifically provides that a motion for discharge must be made at or prior to the commencement of trial. If such a motion is not made before commencement of trial, there is no provision whereby a defendant may raise such a motion.

This seventh assignment of error is found to be without merit.

The judgment of the trial court is affirmed.

*Judgment affirmed.*

Cox, J., concurs.

Donofrio, J., concurs separately.

Gene Donofrio, Judge, concurring.

I respectfully concur with the majority opinion and add a few brief comments as to the third assignment of error regarding the blood evidence.

Testimony presented at trial from the forensic scientist with BCI identified stain samples taken from appellant's car as blood. This blood evidence was not irrelevant or unduly prejudicial under Evid.R. 402 and 403(A).

Appellee argues that the bloodstains were relevant in that they showed that a beating took place. Although the source of the blood was not identified, the evidence was still relevant to show that someone was bleeding in appellant's car.

Bloodstain evidence may be admissible where no source is identified. *State v. Rowe* (1993), 92 Ohio App.3d 652, 637 N.E.2d 29. The trial court has broad discretion in admitting or excluding this type of evidence and should not be reversed unless there is a clear showing of abuse of discretion with attendant material prejudice to appellant. *Id.* Appellant has failed to show an abuse of discretion.

The bloodstain evidence was both relevant and material. In *Rowe*, the court determined that the jury gave the proper weight to the bloodstain evidence after being informed of its shortcomings. Likewise, in this case, the bloodstain evidence was presented to the jury by a forensic scientist. The jury could properly weigh the credibility of this evidence.

Further, appellant did not deny that the victim was assaulted, but rather stated that someone else did it. Appellant also admitted that the victim was in his car after the assault.

I concur that the assignments of error are without merit and should be overruled.