[Cite as *State v. Hudson*, 2011-Ohio-1343.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | CASE NO. 09 MA 89 |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| - VS - | ) | OPINION |
| | ) | |
| JAMES HUDSON, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS:     Criminal Appeal from Common Pleas
                              Court, Case No. 08 CR 1005.

JUDGMENT:                     Affirmed.

APPEARANCES:
For Plaintiff-Appellee:       Attorney Paul J. Gains
                              Prosecuting Attorney
                              Attorney Ralph M. Rivera
                              Assistant Prosecuting Attorney
                              21 W. Boardman St., 6th Floor
                              Youngstown, OH 44503

For Defendant-Appellant:      Attorney Rhys Cartwright-Jones
                              42 N. Phelps Street
                              Youngstown, OH 44503-1130

JUDGES:
Hon. Mary DeGenaro
Hon. Gene Donofrio
Hon. Joseph J. Vukovich

Dated:  March 16, 2011

DeGenaro, J.

{¶1}  Appellant, James Hudson appeals the May 12, 2009 decision of the Mahoning County Court of Common Pleas, which sentenced him to 24 years to life in prison subsequent to a jury finding of guilty of murder, in violation of R.C. 2903.02(A); an accompanying firearm specification, in violation of R.C. 2941.145(A); and, a court finding of guilty on a repeat violent offender specification, pursuant to R.C. 2929.01(DD).

{¶2}  Hudson argues that his murder conviction was against the manifest weight of the evidence and not supported by legally sufficient evidence, and that his speedy trial rights were violated.  Hudson's sufficiency argument is based upon the inadmissibility of a key witness's testimony, due to her alleged incompetence. However, the fact that the key witness was high on crack at the time of the murder did not affect her competency to testify at the time of trial, thus her testimony was admissible.   The key witness's sleep deprivation and intoxication could have undermined her ability to perceive at the time of the incident, but her credibility was not so lacking that a reasonable jury could not have possibly believed her.  Moreover, her version of the events was corroborated by the specific injuries found on the victim and on Hudson's DNA on the firearm that was used to assault the victim.  Although Hudson argues that his DNA got on the firearm by merely handling it, and implies that someone else could have killed the victim, the State provided substantial evidence that identified Hudson as the perpetrator.  Finally, Hudson waived the speedy trial issue by failing to raise it during the proceedings below.

{¶3}  Therefore, Hudson's conviction was based on sufficient evidence and not against the manifest weight of the evidence.  Accordingly, the decision of the trial court is affirmed.

**Facts and Procedural History**

{¶4}  On August 28, 2008, Hudson was indicted for aggravated murder, in

violation of R.C. 2903.01(B)(F), aggravated robbery, in violation of R.C. 2911.01(A)(3)(C); and, abuse of a corpse, in violation of R.C. 2927.01(B)(C), with firearm and repeat violent offender specifications, pursuant to R.C. 2941.145(A) and R.C. 2929.01(DD) (now codified as R.C. 2929.01(CC)), respectively.

**{¶5}** On September 8, 2008, Hudson entered a plea of not guilty and was appointed counsel. On October 31, 2008, the trial court granted counsel's motion to withdraw, and appointed new counsel to defend Hudson's case. Subsequent to discovery, various motions to continue, and multiple pretrial hearings, the trial court filed a Judgment Entry on March 13, 2009, scheduling a trial date of April 20, 2009, and noting, "[a]lthough the Defendant refuses to sign a general waiver of speedy trial, he and his attorney have stipulated with the state that speedy trial issues will not come into play any earlier than Monday, June 15, 2009. The parties also agree that an actual determination of speedy trial days may place the deadline beyond June 15, 2009. In any event, the parties understand that this case shall be set for Jury Trial commencing Monday, April 20, 2009 at 9:00 a.m."

**{¶6}** On April 15, 2009, Hudson filed an additional motion to continue. On April 17, 2009, Hudson submitted a signed "Agreement of Trial Date," acknowledging that the trial date of April 22, 2009 was within the speedy trial time, but refusing to provide a general waiver of his speedy trial rights. On April 22, 2009, the trial court filed a judgment entry noting that it had agreed to postpone the trial as requested by Hudson.

**{¶7}** At the beginning of Hudson's April 22, 2009 trial, the trial court granted Hudson's request for bifurcation of the repeat violent offender specification and bench trial on the issue in the event of a jury conviction on the other counts charged. For its case in chief, the State presented the testimony of ten witnesses, most of who were from the Youngstown Police Department or the Bureau of Criminal Identification.

**{¶8}** Elaine Gonzalez was the key witness for the State, and testified that she had seen Hudson attacking Robbins during the early hours of August 13, 2008. Gonzalez testified that she had been at a house on 2803 Cain Street several times on

the night of August 12, 2008 and the morning of August 13, 2008 to purchase and smoke crack. Earlier in the night, Hudson, Robbins, Chauncey Walker, and additional people known as Pacman, Lee Lee, and Big D, were all at the house on Cain. Throughout the evening Gonzalez would buy crack from Walker, and later from Robbins, leave the house to go on a sex date, return to the house, and buy more crack. When Gonzalez came back at some point in the early morning, only Robbins and Hudson were in the house. Gonzalez had sex with Robbins in exchange for crack, and Hudson, who was working for Walker, manned the front door. When Robbins and Gonzalez had sex, she saw Robbins take his gun out of his pocket, and she identified Exhibit 216 as being the same gun, though now in pieces. Gonzalez and Hudson then smoked crack together in the kitchen. Gonzalez and Hudson shared their crack with each other multiple times during the night.

{¶9} Gonzalez left the house around 5:15 a.m. for a sex date, and returned approximately twenty minutes later. She began to knock on the door, but stopped because she heard a commotion inside. Gonzalez looked into the front window of the house, and saw Hudson hit Robbins in the head with the butt of a gun around 15 to 20 times until the gun broke, and then search through Robbins's pockets. Gonzalez ducked down below the window for fear of being seen, and peeked up periodically. Gonzalez heard a noise like bone cracking. Gonzalez did not witness Robbins being shot or cut. She stated that she would not have heard any gunshots occurring during the twenty minutes before she arrived at the house, as she had been a few blocks away. She saw Hudson run toward the kitchen, and heard the sound of doors and drawers being opened and shut. When Hudson returned to the living room, Gonzalez ducked back down, and heard the sound of something heavy being dragged. Gonzalez then ran across the street and hid in the bushes. She next saw Hudson appear from the back of the house, look around, and leave.

{¶10} On cross examination, Gonzalez stated that she had been smoking crack for five days without sleeping when she witnessed the attack. On the night of August 12, she saw many people at the house showing off their weapons to each

other. Gonzalez specified that people were not handing their weapons to each other, only showing them. Gonzalez testified that she did not remember stating during her August 14-August 15 police interview that the people in the house switched their guns with each other.

**{¶11}** A number of drug customers came to the Cain house that night, and Gonzalez estimated that approximately 30 to 50 people had been through the house. Gonzalez explained that a person coming to the house would have to knock to get in, and people manning the door would identify them through the bay window by the front door, and through a small window on the front door. The mat on the door and curtain on the window were thus "in constant motion." Gonzalez testified that, at the time she was looking in the window, the curtain was pulled open wider than as depicted in the photograph taken the following afternoon. She did not remember a small shutter being in the lower corner of the window, and does not remember it obstructing her view.

**{¶12}** Gonzalez did not call the police after she saw the attack on August 13. She encountered the police at approximately 1:30 a.m. on August 14. Gonzalez was still using crack at that time and had not slept. Gonzalez remembered telling the police about the incident, but did not remember any details about what she said or how the conversation with the police started. Gonzalez remembered the police offering to take her to speak with a detective, but Gonzalez refused at that time. Gonzalez was picked up by the police later on the night of August 14, and was questioned by Detective Spotleson late on August 14 or early August 15 at the police station. Gonzalez still had not slept at that point, and she admitted that she did not remember many of the things that she may have said during her interview. She denied that her version of the events had changed since then, and that she answered as best she could, but that she was high, scared and confused at the time she first related her story to the police. She admitted that the statement she wrote directly after her police interview did not have all of the details that she has described during testimony. She stated that she did not intend to leave out information when she was first questioned, and that she was able to give more detail as she was asked more detailed questions.

{¶13} On re-direct examination, Gonzalez read her written statement for the jury: "8/13/08 before six o'clock A.M., I walked to the house on Hilda and Cain and began to knock when I heard a commotion in the house. So I looked through the window, and I see [Hudson] attacking [Robbins] by a gun in his hand and hitting him in the face repeatedly until [Robbins] went limp. Then I see [Hudson] over him rummaging through his pockets. Then he went into the kitchen. I could hear cupboards opening and closing, then [Hudson] came back towards [Robbins]'s body, and I got away from the window and listened. I heard something heavy being drug from the living room into the back. [paused for court reporter] I hid. I heard something in the back, and I see [Hudson] by the garage looking all around back and forth. I identified [Hudson] from the pictures shown to me by Detective Spotleson. Elaine Gonzalez."

{¶14} The State then played the 25 minute recording of Gonzalez's August 14/15 interviews with Spotleson, completed immediately before Gonzalez wrote her statement. Gonzalez was able to relate her name, address, telephone number, social security number, educational and employment history, and other basic information from memory. She described the incident and her actions and locations during the time leading up to the incident, which was largely the same as the description above, with a few possible exceptions. When asked to describe Robbins's revolver, Gonzalez only remembered it being small enough to fit in his pocket. She said she could not remember the revolver's specific attributes because she had seen a number of guns that evening, and stated that "the guys kept switching guns off and on all night." When asked to describe how Hudson had hit Robbins, Gonzalez stated that Robbins hit him "a couple of times," and that the blows were so hard that only one would have killed her. She thought the blows either knocked him out or killed him, because he went limp. She stated that as Hudson was beating Robbins in the head with the gun, she heard something crack. She also stated that Hudson continued to beat Robbins in the head after he went limp. She did not know if or how long Hudson and Robbins had been fighting before she had arrived.

**{¶15}** Gonzalez stated that she had no doubt that it was Hudson she saw beating Robbins with the gun that night. Gonzalez admitted that she depicted Hudson as hitting Robbins "a couple of times" in the recording, and stated earlier during testimony that she saw Hudson hit him 15 to 20 times, however she explained that she was better able to explain the incident in detail once her mind was clearer. Gonzalez testified that she started to get off drugs in September of 2008, and is currently clean and sober.

**{¶16}** Calvin Martin testified that he was Robbins's best friend, and had seen Robbins at the house around 11:00 p.m. or 12:00 a.m. on August 12 for about 15 minutes. He stated that the people in the house were discussing Chauncey Walker's car being shot up earlier, and he did not see anyone handling firearms. Martin was supposed to pick up Robbins at the Cain Street house during the day of August 13. Martin broke into the bathroom window of the house when he was unable to get a response from anyone, and found Robbins's body in the bedroom. Martin called the police, his mother, and various other people to report that Robbins was dead.

**{¶17}** Demetria Robbins testified that she was Robbins's mother. She testified that she did not know Hudson. A few days before the incident, she learned that Robbins associated with Chauncey Walker. On August 13, she told the police that Robbins was afraid of Walker, and that she believed Walker had something to do with Robbins's murder. .

**{¶18}** Detective-Sergeant Rick Spotleson testified that he was a detective in the homicide division who came to the scene on Cain Street on August 13. He initially had a broad list of suspects. He questioned Calvin Martin, Demetria Robbins, and a Mr. Crues. On August 14 Spotleson heard that Officer Anderson had spoken to Gonzalez the night before, and he asked Anderson to write a statement about what Gonzalez had said. Spotleson interviewed Gonzalez, at which time Hudson became the main suspect. Spotleson did not interview other persons of interest, such as Montrell Gilbert, Christopher Martin, David Wright, Tonya Davenport, Calvin Martin's cousin Kevin, Pacman. Hudson remained his main suspect because Gonzalez's

statements were consistent with the crime scene and corroborated by physical evidence. After Spotleson had apprehended Hudson, pictures were taken of his injuries, including a scratch on his neck, and a relatively deep circular cut on his right palm.

{¶19} Officer Michael Marciano testified that he is an officer in the gang unit at YPD who received a warrant for Hudson from the Violent Crimes Task Force, which covers fugitive warrants. Marciano was instructed that Hudson was possibly attempting to get on a bus out of town. The police staked out the Greyhound bus station, and apprehended Hudson as he was attempting to gain admission to a bus. Marciano could not remember the destination of the bus, but thought that it might have been Philadelphia or Cincinnati.

{¶20} Dr. Kenneth Frank Gerston testified that he was the deputy coroner and forensic pathologist who performed Robbins's autopsy. Gerston testified that Robbins had suffered a number of injuries that appeared to have been inflicted in a single short period of time, with no postmortem wounds. Gerston explained that Robbins had three non-fatal bullet wounds to the eye, ear and neck, defensive injuries on his hands, and an extremely deep laceration on the neck, which severed his trachea and scratched his cervical vertebrae. Robbins had over twenty wounds to his scalp, generally in elliptical and rectangular shapes, and multiple injuries to his skull, from heavy blows. Gerston was not able to determine the order in which the different injuries were inflicted during such a short period of time.

{¶21} Officer Anthony Marzulo testified that he was called to the murder scene on August 13 to collect evidence for the crime lab. He took approximately 75 photos of the scene, and collected various items including the broken Burgo Model 66 .22 caliber revolver with four spent rounds in the cylinder. There were blood stains on the living room walls and all over one of the couches, and he took swabs from the various stains. He collected pieces of broken glass located in the living room, and located under the body of the victim in the back bedroom. Marzulo took an oral swab from the victim, and upon obtaining a search warrant, took an oral swab from Hudson.

{¶22} Johnathan Gardner testified that he was the BCI forensic scientist who examined the firearm and bullet fragments recovered from the scene and the victim. He concluded that the fragments were consistent with being from a .22 caliber revolver, but he was unable to conclude with certainty that they came from the .22 caliber revolver recovered from the scene.

{¶23} Chad Britton, a forensic scientist at the biology section of BCI, testified that the swabs collected by Marzulo tested presumptive positive for blood. Brenda Gerardy, a forensic scientist at the biology DNA section of BCI, testified that she performed DNA testing on the swabs collected by Marzulo, and compared them with the known standards collected from Hudson and Robbins. Most of the samples had Robbins as the single source contributor of DNA, but the samples from the trigger and handle of the revolver, and from a swab of a stain on Robbins's shoe, showed a mixture of two contributors. The tests from the handle of the revolver showed Robbins as the major DNA contributor and Hudson as the minor DNA contributor. The tests from the shoe and the trigger of the revolver showed Robbins as the major contributor, and they did not show any differing DNA that could have ruled out Hudson as the minor contributor, but there was not enough DNA to be conclusive about the identity of the minor contributor.

{¶24} After the State rested its case in chief, it offered approximately one hundred photos, objects recovered from the scene, and a partially redacted autopsy report into evidence, all of which were received with no objections. The State withdrew all of the BCI reports, Gonzalez's written statement, and the recording of Gonzalez's interview. Upon Hudson's Crim.R. 29 motion, the trial court dismissed Count Three of the indictment for abuse of a corpse, in violation of R.C. 2927.01(B)(C). However, the trial court denied the motion regarding the counts for aggravated murder, in violation of R.C. 2903.01(B)(F); aggravated robbery, in violation of R.C. 2911.01(A)(3)(C), with R.C. 2941.145(A) firearm specifications; and, also decided to include the lesser offense of murder in the event that the jury did not find Hudson guilty of the predicate felony of aggravated robbery.

{¶25} Before Hudson's case in chief, the trial court entered into a colloquy with Hudson to ensure that he understood his right to choose whether to testify. The trial court addressed the State's request that immunity be granted to Chauncey Walker for his testimony in the defense's case in chief. The trial court granted immunity to Walker for any testimony relating to his illegal drug activities.

{¶26} Chauncey Walker testified that he was a drug dealer, and that he sold drugs at the house on Cain Street. He testified that he had been selling drugs there on the night of August 12, and that he had sold some to Gonzalez that night. At approximately 9:30 or 10:00 p.m., Walker did not know of any more customers coming, and was tired, and so he left the Cain Street house for the night. He testified that Robbins was a close friend, but did not deal drugs for Walker, nor did he watch the door for Walker during his drug sales. On the night of August 12, Walker did not see any weapons on anyone in the house. He was not supposed to be around guns due to his firearm disability, so he told everyone not to bring guns around him, and he was therefore selling drugs without the protection of weapons. Walker testified that he is currently imprisoned for a parole violation. On cross-examination, Walker testified that he knew Hudson had loaned or rented a vehicle to Robbins, but had not told Robbins that the car was stolen, and Robbins had gotten arrested for driving that car. Walker did not remember Robbins being mad at Hudson, and was only mad that he had been incarcerated.

{¶27} Officer Anthony Tulipano testified that he had been the second to arrive at the scene, and spoke with Calvin Martin. The first officer, Davis, forced open the back door to gain access into the house. Tulipano testified that the back door was not locked, but was forced shut, and "had like a board against it or something partially. * * * Partially or there on the floor." On cross examination, Tulipano testified that the board was "[j]ust laying on the floor like blocking it partially," and that it did not appear as though it had intentionally been put there. On re-direct examination, Tulipano testified that the board was laying on the ground, and that the door was not stuck shut because of the board. Officer Russell Davis testified that he broke the rear door open

with his shoulder. He testified that the door was locked, but that it was not "secured real tight" because the door and lock were flimsy.

{¶28} Officers Francis Bigowsky and George Anderson testified that they had encountered Gonzalez on the street at approximately 1:30 a.m. on the morning of August 14. Anderson was the one to speak directly with Gonzalez, and was the one who later submitted an informational memo about the conversation to Spotleson. Anderson testified that he often stopped people in the street when patrolling the area to ask for general information. He asked Gonzalez if she knew of anything going on, and she replied that "what happened on Cain wasn't right." Gonzalez told Anderson about Robbins and Hudson, though Anderson could not tell from her description whether she actually saw Robbins being killed, or what exactly she had or had not seen and/or heard.

{¶29} After Hudson rested his case, he withdrew all of the exhibits referenced during testimony. He proffered a recording of Spotleson's interrogation of Hudson to preserve it for the record, and renewed his Crim.R. 29 motion, which the trial court overruled. After closing arguments, instructions, and deliberations, the jury could not reach a verdict for the aggravated murder charge. The jury did not indicate their decision on the aggravated robbery charge, the parties assumed that the jury could not reach a verdict, and the State opted to drop the aggravated robbery count. The jury returned a guilty verdict on the lesser included offense of murder, with an accompanying firearm specification. The trial court then re-confirmed that Hudson waived his right to a jury determination of the repeat violent offender specification. The State provided a certified copy of Hudson's prior conviction for aggravated robbery on July 30, 1996, and the trial court found Hudson guilty of the specification.

{¶30} On May 7, 2009 the trial court held a sentencing hearing, wherein the State provided victim impact statements and requested a maximum sentence of 28 years to life in prison: fifteen years for murder, three years for the gun specification, and ten years for the repeat violent offender specification. The trial court heard arguments from counsel, and Hudson declined the invitation to personally address the

court. The trial court imposed the mandatory sentence of fifteen years to life for murder, the mandatory sentence of three years for the gun specification, and six years for the repeat violent offender specification, for a total of 24 years to life.

## Manifest Weight

**{¶31}** Hudson's first of three assignments of error asserts:

**{¶32}** "The manifest weight of the evidence supported acquittal."

**{¶33}** After briefly explaining the difference between a manifest weight and a sufficiency inquiry, Hudson lists ten facts or inferences from the record and concludes that the manifest weight supported his acquittal.

**{¶34}** Under a criminal manifest weight of the evidence standard, the appellate court, after "'reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717.

**{¶35}** This court's discretionary power to reverse on manifest weight grounds and grant a new trial is exercised only in the exceptional case where the evidence weighs heavily against conviction. *Thompkins* at 387. This standard is a high one because the trier of fact was in a better position to determine credibility issues, by having personally viewed the demeanor, voice inflections and gestures of the witnesses. *State v. Ali*, 154 Ohio App.3d 493, 2003-Ohio-5150, 797 N.E.2d 1019, at ¶36; *State v. DeHass* (1967), 10 Ohio St.2d 230, 231, 39 O.O.2d 366, 227 N.E.2d 212. A reviewing court therefore should not interfere with the witness credibility and factual determinations of the jury, unless the record demonstrates that a reasonable juror simply could not have found the witness to be credible. *State v. Mock*, 187 Ohio App. 3d 599, 2010-Ohio-2747, 933 N.E.2d 270, at ¶40.

**{¶36}** Hudson was convicted of murder, under R.C. 2903.02(A), which proscribes purposefully causing the death of another. Hudson contends that his

murder conviction was against the manifest weight of the evidence, focusing on the element of identity, arguing: 1) Gonzalez's testimony was so unbelievable that no reasonable juror could have found her to be credible; 2) the unfavorable DNA evidence had been completely undermined; and, 3) there were a number of other people that could have had an interest in killing the victim.

{¶37} Gonzalez was the only person known to have witnessed any of the events immediately preceding Robbins's death. Gonzalez identified Hudson as Robbins's attacker from a photo array given by the police. At trial, Gonzalez testified that she had witnessed a portion of Hudson's attack on Robbins in the early hours of August 13, 2008. Gonzalez testified that she had been at the house on Cain Street several times on the night of August 12, 2008, that many people had been in and out of the house that night, but that only Hudson and Robbins had been present in the house during Gonzalez's penultimate visit around 4:00 or 5:00 in the morning. During that visit, Gonzalez had sex with Robbins in exchange for crack while Hudson watched the front door, and then Gonzalez and Hudson smoked crack together in the kitchen. Gonzalez departed around 5:15 a.m. for a sex date and returned approximately twenty minutes later. She began to knock on the door, but stopped because she heard a commotion inside. Gonzalez looked into the front window of the house, and saw Hudson hit Robbins in the head with the butt of a gun until the gun broke, and then search through Robbins's pockets. Gonzalez heard a noise like bone cracking. Gonzalez did not witness Robbins being shot or cut. She saw Hudson run toward the kitchen, and heard the sound of doors and drawers being opened and shut. When Hudson returned to the living room, Gonzalez ducked back down, and heard the sound of something heavy being dragged. Gonzalez then ran across the street and hid in the bushes. She next saw Hudson appear from the back of the house, look around, and leave.

{¶38} Hudson first argues that Gonzalez lacked credibility because she had been awake and smoking crack for approximately 124 hours by the time she witnessed the incident and for approximately 156 hours by the time she described the

incident to the police, because her story was lacking in detail at the time of her initial report to the police and became more elaborate over time, because it would have been impossible for Gonzalez to have heard the sound of a bone breaking from a few feet outside of a house, and because it would have been impossible for Hudson to have departed through the back door because it was blocked from the inside

{¶39} Regarding the blocked door, trial testimony does not completely support Hudson's factual claim. Two police officers testified that they were at the back of the house when they forced the door open. Tulipano, the officer watching the door being forced open, testified that the door was unlocked, but was stuck or forced shut. He testified that there was a board on the floor, partially blocking the doorway, though he did not believe that the board had intentionally been placed there, and the board was not blocking the door shut. Davis, the officer who broke the door open, testified that the door had been locked, but that the lock and door were very flimsy. He did not mention anything about the door being blocked. Given this testimony, a jury would be able to believe Gonzalez's statement that she saw Hudson behind the house after the attack.

{¶40} Gonzalez consistently admitted that she had been high on crack at the time of the murder, at the time she initially spoke to the police, and had still not slept by the time she provided a written statement and underwent a recorded interview with the police. Gonzalez admitted that smoking crack could make her paranoid and confused, that she could not remember most of the details of her conversation with the police at 1:00 a.m. on August 14, or many of the things she stated during her interview at the police station. Gonzalez admitted that her initial statement to the police was less detailed than her testimony at trial, though she also noted that she was able to provide more detail later when she was clear-headed and when she was asked more detailed questions about the incident.

{¶41} Gonzalez also testified that she had known Hudson prior to the date of the incident, and had smoked crack with Hudson multiple times on the night of August 12. Despite being under the influence, Gonzalez had no doubt that it was Hudson she

saw beating Robbins with the gun that night. Because Gonzalez personally knew Hudson, her identification of Hudson could reasonably be believed by a jury. See *State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, 781 N.E.2d 980, at ¶79. The jury was certainly free to question Gonzalez's credibility based upon her testimony regarding her sleep deprivation and use of crack. In assessing her credibility, the jury was also free to consider things such as Gonzalez's demeanor in the police interview video and at trial, the general consistency of her statements, her familiarity with Hudson and Robbins, and the forensic evidence that corroborated Gonzalez's testimony regarding Hudson's conduct.

**{¶42}** Gerston, the deputy coroner, testified that Robbins had over 20 wounds on his scalp and perforations in his skull, which were attributable to heavy blows with a hard object. Police recovered a broken .22 caliber revolver from the scene, which tested presumptively positive for blood. DNA testing on the revolver indicated that there was a mixture of one major and one minor DNA contributor on the handle of the revolver. Robbins was the major DNA profile, and Hudson was identified as the minor DNA profile on the handle of the revolver.

**{¶43}** The forensic evidence presented at trial is consistent with Gonzalez's description of the incident, and supports her credibility. Moreover, it is axiomatic that the weight and credibility to give witness evidence are issues that the jury must determine. See *State v. Dye* (1998), 82 Ohio St.3d 323, 329, 695 N.E.2d 763; *State v. Williams* (1995), 73 Ohio St.3d 153, 165, 652 N.E.2d 721. Here, the jury chose to believe Gonzalez's testimony, despite the evidence of her drug use and sleep deprivation. It is not possible to conclude that the jury unequivocally lost its way in finding Gonzalez's testimony to be believable, and thus this court will not substitute its judgment for that of the jury.

**{¶44}** Hudson next argues that although his DNA was found on the handle of the revolver, no conclusions could be made as to whether Hudson was the minor contributor of DNA found on the trigger of the revolver. Hudson also contends that the revolver had been passed around to multiple people throughout the evening.

{¶45} Gerardi, the biology DNA forensic scientist at BCI, testified that her DNA testing on the revolver indicated that there was a mixture of one major and one minor DNA contributor on the trigger and the handle.   Robbins was the major DNA profile on both areas, and Hudson was identified as the minor DNA profile on the handle of the revolver.  The partial minor DNA profile on the trigger of the gun was not inconsistent with Hudson, and thus Hudson could not be ruled out as the minor contributor, but the data was insufficient to be conclusive about the minor contributor.

{¶46} Calvin Martin testified that he had been at the Cain Street house around 11:00 or 12:00 p.m. for approximately fifteen minutes on the night of August 12, and did not see anything being done with firearms.  Chauncey Walker testified that he had been at the house until approximately 10:00 p.m., and that no one had been showing firearms at that time.  Walker denied that this testimony on the absence of firearms was motivated by the potential penalty for his being around firearms while under disability.  When asked to describe Robbins's revolver during her interview with the police, Gonzalez only remembered it being small enough to fit in his pocket.  She said she could not remember the revolver's attributes because she had seen a number of guns that evening, and stated that "the guys kept switching guns off and on all night." At trial, Gonzales testified that various people in the house showed off their firearms to each other during the evening, but that they did not actually hand their firearms to each other.   Gonzalez testified that she did not remember stating during her police interview that the people in the house switched guns with one another.

{¶47} Although Hudson is implying that any presence of his DNA on the firearm would have come from the gun being passed around, the evidence at trial does not support this implication.  Gerardi did not detect the presence of any other minor DNA profiles apart from Hudson's, which undermines the argument that a number of different people handled the weapon shortly before Robbins's death.  Although the testimonial evidence on this issue is contradictory, the jury did not lose its way if it chose to not believe any of the testimony.

{¶48} Finally, Hudson argues that there were approximately 40 people who

passed through the house on Cain Street that night, all of whom could have had an interest in killing Robbins. The only evidence at trial addressing this issue was the testimony of Demetria Robbins, Robbins's mother, that she had told the police that she thought Chauncey Walker was involved with Robbins's death. However, Hudson chose not to inquire further about this issue when he brought Walker to the stand to testify. The jury did not lose its way by choosing to believe the testimony and physical evidence identifying Hudson as the perpetrator, even in light of the possibility that other people might have wanted to kill Robbins.

{¶49} Given all of the foregoing, the record contains substantial credible evidence from which the jury concluded that the State had proven all of the elements of murder, including the identification of Hudson as the perpetrator, without having lost its way. This is not one of those rare cases where the evidence presented weighs heavily against conviction. Accordingly, Hudson's first assignment of error is meritless.

### Sufficiency of the Evidence

{¶50} Hudson's second assignment of error asserts:

{¶51} "The trial court based its conviction on insufficient evidence, and erred in denying the defense's motions under Crim.R. 29."

{¶52} "Sufficiency of the evidence is the standard applied to determine whether the case may go to the jury or whether the evidence is legally sufficient as a matter of law to support the jury verdict." *State v. Smith* (1997), 80 Ohio St.3d 89, 113, 684 N.E.2d 668. Thus, sufficiency is a test of adequacy. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541. Whether the evidence is legally sufficient to sustain a verdict is a question of law. Id. In reviewing the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Smith* at 113.

{¶53} Hudson was convicted of murder, under R.C. 2903.02(A), which proscribes purposefully causing the death of another. As discussed above, the only element at issue is the identity of the person who purposefully caused the death of

Robbins. Hudson's only argument is that Gonzalez's testimony was inadmissible due to incompetency, and that there was insufficient evidence to convict Hudson absent Gonzalez's testimony.

{¶54} As Hudson correctly concedes, Gonzalez's competency to testify was not addressed at any point during the proceedings below, and thus he has waived this argument absent plain error. Pursuant to Crim.R. 52(B), plain error means an obvious defect in the trial proceedings that affected the defendant's substantial rights. *State v. Barnes* (2002), 94 Ohio St.3d 21, 27, 759 N.E.2d 1240. The plain error doctrine is only utilized in the exceptional circumstance where the outcome clearly would have been different had the error not occurred. *State v. Waddell* (1996), 75 Ohio St.3d 163, 166, 661 N.E.2d 1043.

{¶55} Evid. R.601 bars the testimony of incompetent witnesses at trial. The focus is on the witness's capacity at the time of trial, and not at any other time. See, e.g., *State v. Bradley* (1989), 42 Ohio St.3d 136, 140-141, 538 N.E.2d 373 (prior judicial declaration of incompetence was inconsequential where the trial court's inquiry at trial determined that the witness was competent to testify at that time); *State v. Parker*, 2d Dist. No. 21599, 2007-Ohio-1512, at ¶22 ("The fact that [the witnesses] were under the influence of crack cocaine at the time of the alleged offenses affects only the credibility of their testimony, not its admissibility.").

{¶56} Hudson's only identifiable argument against Gonzalez's competency was that she was under the influence of crack and sleep deprivation at the time of the incident. Gonzalez testified that she had been clean and sober since September of 2008, thus not under the influence of drugs at the time of trial, and Hudson does not refute this statement. Hudson's argument fails because Gonzalez's altered state at the time of the incident only affected the weight and credibility of her testimony at trial, but did not affect Gonzalez's competency to testify at the time of trial.

{¶57} Hudson has failed to demonstrate that Gonzalez's testimony was inadmissible at trial. The State presented evidence that Hudson purposefully caused the death of Robbins, and thus presented legally sufficient evidence to support a

conviction for murder in violation of R.C. 2903.02(A).  Accordingly, Hudson's second assignment of error is meritless.

### Speedy Trial

{¶58} Hudson's third and final assignment of error asserts:

{¶59} "The prosecutor's office neglected to bring [Appellant] to trial timely."

{¶60} Because Hudson was held in jail pending his trial on felony charges, the State was obligated to bring Hudson's trial within ninety days after his arrest.  R.C. 2945.71(C)(2),(E).  Felony charges are to be dismissed if the State does not comply with this time requirement.  R.C. 2945.73(A).  However, this court has consistently held that a defendant must file a motion to dismiss on speedy-trial grounds during the proceedings below, or else the issue is waived on appeal.  See *State v. Mock*, 187 Ohio App.3d 599, 2010-Ohio-2747, 933 N.E.2d 270, at ¶15, citing *State v. Turner* (2006), 168 Ohio App.3d 176, 2006-Ohio-3786, 858 N.E.2d 1249, ¶21, and *State v. Trummer* (1996), 114 Ohio App.3d 456, 470-471, 683 N.E.2d 392.  Because Hudson failed to do so, he has waived the issue.  Accordingly, Hudson's third assignment of error is meritless.

{¶61} In conclusion, Hudson's convictions were supported by legally sufficient evidence and were not against the manifest weight of the evidence, and Hudson waived the issue of speedy trial for appeal.  Accordingly, the judgment of the trial court is affirmed.

Donofrio, J., concurs.

Vukovich, J., concurs.